700 So.2d 199 (1997)
Melvin and Lou M. FOSTER
v.
DESTIN TRADING CORPORATION and Blessey Marine Services, Inc.
No. 96-C-0803.
Supreme Court of Louisiana.
May 30, 1997.
Order Clarifying Decision on Grant of Rehearing October 21, 1997.
*200 John J. McKeithen, Russell Alan Woodard, McKeithen, Ryland & Champagne, Columbia, for Applicant.
John J. McKeithen, Louis V. Champagne, Rebel G. Ryland, McKeithen, Ryland & Champagne, Columbia, Russell A. Woodard, Woodard & Woodard, Columbia, for Applicant on Rehearing.
Daniel Edward Knowles, Lars Perkins, Burke & Mayer, New Orleans, for Respondent.
JOHNSON, Justice.[*]
Plaintiffs, Melvin and Lou M. Foster filed this action for damages under 46 U.S.C. § 688, commonly referred to as the Jones Act, and general maritime law pursuant to the saving to suitor clause. Foster suffered an injury on September 5, 1991, while employed as a relief captain on the M/V Laura Ann Blessey. Named as defendants were Destin Trading Corporation (hereinafter referred *201 to as "Destin"), owner of the two barges and Foster's employer, Blessey Marine Services, Inc. (hereinafter referred to as "Blessey"). The trial court found the law and evidence to favor the defendants and dismissed the action.[1] Foster then appealed to the Fifth Circuit. Foster v. Destin Trading Corp., 670 So.2d 1342 (La.App. 5 Cir. 1996). In a 2-1 decision, the appellate court found that Foster knew that his use of the board was against company policy and that Blessey had advised its employees not to use boards as a walkway. They opined "We cannot say the trial court erred in finding Blessey exercised reasonable care to maintain a reasonable safe work environment and is therefore not negligent."[2] In his dissenting opinion, Judge Cannella found that the vessel was unseaworthy and that Blessey was negligent. He assessed 20% liability to the owner, 40% liability for the employer's negligence with the remaining 40% placed on Foster for his failure to take action in disposing of the cracked board.[3]
Plaintiff's writ application was granted so that we could determine whether the court of appeal applied the appropriate standard of review. Because we find that both lower courts erred in denying recovery to plaintiff, we reverse the assessment of liability and remand this matter to the court of appeal for a ruling consistent with the conclusions reached herein.

FACTS
Plaintiff, Melvin Foster was employed as a relief captain aboard the M/V Laura Ann Blessey on the date of his injury, September 5, 1991. The M/V Laura Ann Blessey had two barges in tow, WEB 205 and WEB 206 both of which were owned by Destin. The vessels were moored at the dock of the Houston Fuel Oil Terminal in Houston, Texas.
Oil was being discharged from each of the barges to the terminal. The two barges had cargo compartments thirty inches above the walkway of the vessel. Each barge had a hatch cover located at the mid point and at both ends. Three boards extended across from the tank of WEB 205 to WEB 206 at points approximately even with the hatch covers. These boards provided a direct route from cargo compartment to cargo compartment and were requested by the tankermen to conveniently cross from barge to barge. The tankermen would put the boards out when the barges were breasted (side by side) at the dock and take them down when the barges were moved. The boards that were used as a walkway were three 2" × 12" × 16" pressure treated pine boards.
During pumping operations, the tankermen checked the cargo compartment hatches for the level of product. The boards were laid even with the three hatches, so that the tankermen moved from cargo compartment to cargo compartment rather than down to the walkway across to the connecting barge then up to the cargo compartment.
Just before the accident, two U.S. Coast Guard officers boarded one of the barges for a routine inspection, and one of Blessey's seamen was asked to produce his tankerman's certificate. Because he did not have the document on his person, the tankerman went to the Laura Ann Blessey and asked Foster to retrieve it. When he returned with the certificate, plaintiff was informed by the tankerman that he believed the Coast Guard was going to issue a citation because the hatches were open. Plaintiff was injured as he was crossing from the top of barge WEB 205 to barge WEB 206 which was the shortest route, when the wooden board connecting the barges broke, causing him to fall approximately 30 inches to the walkway below.
Foster was taken to Hermann Hospital and diagnosed with an open medial dislocation of the right subtalar joint and the right talonavicular joint. The treating physician also noted torn ligaments. Surgery was performed, *202 with screws placed in plaintiff's right ankle to assist in the healing process. He was released after a seven day hospital stay.

DISCUSSION
Plaintiff has asserted two theories for his recovery, namely negligence and unseaworthiness. Based on these theories, the appropriate standard of review is the manifest error, clearly wrong standard. Cormier v. Cliff's Drilling Co., 640 So.2d 552 (La.App. 3 Cir.1994).
Plaintiff was employed by Blessey and the barges were owned by Destin. Both corporations are owned by the same individuals, Walter Blessey, Jr., President of the corporations and his children. The facts of this case place it in a rather unique posture based on the apparent inseparability of employer and owner. This fact is noted in plaintiff's petition wherein it states that plaintiff was an employee of Destin and/or Blessey, and that the vessel was owned and operated by Destin and/or Blessey. However, plaintiff's asserted theories of recovery are separate and distinct, therefore he must meet two burdens of proof. Cormier, supra at 555; Hae Woo Youn v. Maritime Overseas Corp., 605 So.2d 187 (La.App. 5 Cir.1992), modified on other grounds 623 So.2d 1257 (La.1993); Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971).
An injured seaman is allowed to join a claim for unseaworthiness, for maintenance, cure and wages, with a Jones Act suit.[4] Seamen are allowed to bring their Jones Act claims in state court pursuant to the "saving to suitor" clause of the Judiciary Act of 1789. In matters involving admiralty and maritime jurisdiction, the saving to suitor clause permits state courts to have concurrent jurisdiction with the federal district courts. Green v. Industrial Helicopters, Inc., 593 So.2d 634 (La.1992), rehearing denied, certiorari denied, 506 U.S. 819, 113 S.Ct. 65, 121 L.Ed.2d 32 (1992); Parker v. Rowan Companies, Inc., 599 So.2d 296, certiorari denied, 506 U.S. 871, 113 S.Ct. 203, 121 L.Ed.2d 145 (1992); La. C.C.P. art. 1732(6). Accordingly, jurisdiction of this matter was proper in state court.[5]

Unseaworthiness
The doctrine of unseaworthiness was introduced to general maritime law in 1903 in The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760.[6] The case holds that an owner is responsible to the captain or any seaman thereof for injuries received because of the unseaworthiness of the vessel. This liability was imposed on the owner by the Merchants' Shipping Act of 1876, and there is an implied obligation that all reasonable means shall be employed to insure the seaworthiness of a vessel before and during voyage.
A vessel is unseaworthy unless all of its appurtenances and crew are reasonably fit and safe for their intended purposes. Griffin v. LeCompte 471 So.2d 1382 (La.1985); Youn, supra at 198: Cormier, supra at 555; Faul v. State, DOTD, 649 So.2d 493 (La.App. 3 Cir.1994); See also, Phillips v. Western Co. of North America, 953 F.2d 923 (5th Cir. 1992).
Our case law places a very high burden on a vessel owner to provide its crew with a seaworthy ship. This duty is absolute, non-delegable and completely independent of the Jones Act requirement to exercise reasonable care. To prevail on an unseaworthiness claim, a seaman must prove that the unseaworthy condition was the proximate cause of his injury. Youn, supra at 198. Cormier, supra at 555.
An owner's absolute duty to provide a seaworthy vessel may not be delegated to anyone. Liability for an unseaworthy condition does not depend on negligence, fault or blame. Thus, if an owner does not provide a seaworthy vessel, then no amount of prudence will excuse him, whether he knew of or should have known of the unseaworthy condition. T.J. Schoenbaum, Admiralty and *203 Maritime Law, Second Edition § 6-26 (1994).
An owner's duty to provide a seaworthy vessel has been held to encompass the means by which individuals are provided ingress and egress to the vessel. In Reyes v. Marine Enterprises, Inc., et al, 494 F.2d 866 (1974) a longshoreman[7] filed an action based on injuries received when he slipped and fell from an allegedly unstable, poorly lit gangway while boarding a barge. He sued the defendants under both theories of unseaworthiness and negligence. At the close of his evidence, a directed verdict was granted on both counts for the defense, and plaintiff appealed.
On appeal, the case was reversed and remanded for a new trial. The appellate court determined that seaworthiness entails a vessel owner's duty to provide his crew with a ship and equipment that are suitable, including suitable means to board and disembark the vessel. The court concluded that this duty extends to gangways by whomever supplied, controlled or owned. The court further concluded that where a crewman is injured by an "unfit", unseaworthy gangplank which is an appurtenance of the ship, he has the right to recover from the vessel's owner.
In THE PHOENIX, 3 F.Supp. 1017 (S.D.Tex.1933), a seaman was awarded damages for injuries sustained while descending a ship by means of a Jacob's (rope) ladder. In that case, the plaintiff boarded the steamship Phoenix, in an attempt to find employment. He climbed aboard by means of the rope ladder that was hanging over the side. Upon being hired, plaintiff was granted permission to go ashore to obtain his clothes. He exited the vessel in the same manner he boarded it. While plaintiff was descending the Jacob's ladder, it broke, and plaintiff injured his right hand and arm.
At the time plaintiff boarded the vessel, there were no other means of doing so and it was customary for seamen to use the rope ladder under the circumstances. The court found that the ladder was unseaworthy because it was old, worn out and not sufficiently strong enough to withstand the weight of an ordinary man. It was determined that this unseaworthy condition was the proximate cause of plaintiff's injuries. The court found that the condition of the rope ladder was known to the ship's officers, or, if not known, it could have been discovered by ordinary and reasonable diligence.
In this case, trial testimony revealed that Foster ordered oak boards through the Blessey/Destin office but treated pine boards were delivered by the supplier. Because these wooden boards were used by plaintiff and the other crewmen as a means of boarding and disembarking the vessel, they are synonymous with the gangway described in Reyes. Our inquiry is whether the three boards were being used for their intended purpose. The facts of this case show that seamen were using these boards to cross from one vessel to the other for at least five to six weeks prior to plaintiff's slip and fall. Tankerman John Riojas testified that he obtained his tankerman's certificate in 1982 and that it was common to use boards on barges in the manner in which Foster was using them at the time of his fall. On the other hand, Walter Blessey, Jr. testified that it was against company policy for anyone to use boards as a walkway on his vessels. The lower courts relied on this self-serving testimony and held that the defendants had no knowledge its seamen were using the boards as described. However, Riojas' testimony proves that this practice of using boards to cross from one barge to the other was a common practice in the maritime industry, but more importantly, was in use by Blessey's employees. The facts from THE PHOENIX, differ from the instant matter in that Foster could have taken another route to cross from one vessel to the next but the facts also make it clear that using the boards was the most direct route.
Tankerman Paul Yates even testified that the crew members performed maintenance on these boards by painting them and applying a skid resistant substance to them "so *204 that when it got wet, that they would not you wouldn't skip on them."[8] The facts show that Destin failed to provide adequate equipment to its crew. Destin could have provided a sturdier board or provided portable aluminum walkways to the vessel. Riojas testified that they were used on other vessels. Because the boards failed when used for their intended purpose, the vessel was unseaworthy.
Unseaworthiness results from a defective condition and is not the result of an isolated negligent act. Daughdrill v. Ocean Drilling and Exploration Co. (ODECO), 709 F.Supp. 710 (E.D.La.1989); Meyers v. M/V EUGENIO C, 842 F.2d 815 (5th Cir.1988). Also, wear and tear which result in the deterioration of equipment may render a previously seaworthy vessel unseaworthy. Caudill v. Victory Carriers, Inc., 149 F.Supp. 11 (E.D.Va.1957); Cannella v. Lykes Bros., 174 F.2d 794 (3rd Cir.1949). Just as the vessel involved in The Phoenix, which presumably contained a seaworthy ladder but over time became defective, the board used by Foster initially proved to be seaworthy, but deteriorated to the extent that it was not fit to be used for traversing from vessel to vessel. Thus, the vessel was not seaworthy. After reviewing all of the evidence herein, we conclude that the majority opinion rendered by the appellate court in finding the vessel seaworthy was legal error.

Plaintiff's Negligence
Comparative negligence applies to both unseaworthy claims as well as Jones Act negligence actions. Cormier, supra at 556. To prove comparative negligence on the part of the plaintiff, the defendant has to show that the plaintiff was contributorily negligent and that such negligence was a proximate cause of the resulting injury. Miles v. Melrose, 882 F.2d 976 (5th Cir.1989). The effect of finding negligence on the part of a seaman seeking recovery in a seaworthiness action or Jones Act claim is only to reduce damages proportionately, but not to bar recovery. A seaman's negligence will not defeat his claim under the Jones Act and general maritime law but may be considered as comparative negligence to mitigate damages in proportion to the degree of his negligence. Portier v. Texaco, Inc., 426 So.2d 623 (La.App.1982), writ denied 433 So.2d 165 (La.1983); Scott v. Fluor Ocean Services, Inc., 501 F.2d 983 (1974); Griffin, supra at 1389. Contributory negligence, however gross, does not bar recovery but only mitigates damages. Johnson v. Offshore Exp., Inc., 845 F.2d 1347, (5th Cir.1988), rehearing denied, cert. denied 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 533 (U.S.La.,1988).
Our review shows that Foster was negligent. First of all, he admitted he ordered oak boards and that they would safely hold the weight of the crew members. Yet when pine boards were delivered, the record shows that he failed to inform the captain or the office so that the proper boards could be delivered. Paul Yates weighed more than 400 pounds, and testified that he heard one of the boards make a "crack" sound when he attempted to walk across it. Riojas stated that he knew that one of the boards had a crack in it and some seamen refused to walk across this board. He further stated that it was an individual's choice whether to walk on this board, but because he weighed 160 pounds he did not fear any danger.
At the time of his injury, Foster weighed approximately 325 pounds. While he may have weighed less than Yates, he was twice the weight of Riojas. Although there was no evidence that the board from which he fell was the one with the crack, because of his weight, plaintiff should have taken extra precautions to avoid the possibility of walking on a cracked board. As relief captain, he should have removed the potential hazard of having his crew walk across a defective board. Accordingly, we hold him negligent for failing to remove the cracked board.

Jones Act
Next, we must decide whether the employer's conduct falls within the realm of Jones Act negligence, 46 U.S.C.App. § 688. An employer is vested with a fundamental duty to provide its seamen with a reasonably safe workplace. Ivy v. Security Barge Lines, Inc., 585 F.2d 732 (5th Cir.1978). An employer's negligence may arise from a dangerous *205 condition on or about the vessel, failure to use reasonable care to provide a seaman with a safe place to work, failure to inspect the vessel for hazards and any other breach of the owner's duty of care. Davis v. Hill Engineering, Inc., 549 F.2d 314 (5th Cir. 1977).
Unlike the duty owed to seamen for a claim of unseaworthiness, the duty to provide a safe workplace is not absolute, but reasonable care under the circumstances sets the standard. Ober v. Penrod Drilling Co., 694 F.2d 68 (5th Cir.1982), modified on other grounds 726 F.2d 1035 (1984). However, the burden of proof based on negligence is feather light and only the slightest degree of negligence is sufficient to impose liability on an employer. Cormier, supra at 555; Caravalho v. Dual Drilling Services, Inc., 631 So.2d 725 (La.App. 3 Cir.1994) writ denied 637 So.2d 1074 (La.1994); Mistich v. Pipelines, Inc., 609 So.2d 921 (La.App. 4 Cir. 1992) writ denied 613 So.2d 996 (La. 1993) certiorari denied, Brown & Root, Inc. v. Mistich, 509 U.S. 913, 113 S.Ct. 3020, 125 L.Ed.2d 709 (1993); Osorio v. Waterman S.S. Corp., 557 So.2d 999 (La.App. 4 Cir. 1990) writ denied, 561 So.2d 99 (La.1990).
In affirming the trial court's dismissal of plaintiff's action, the appellate court relied on Blessey's trial testimony that the use of a board as a gangway between barges was against company policy, and that the vessel's crew was advised not to use the boards in this manner. The trial court found and the appellate court agreed, that the employer had exercised reasonable care to maintain a reasonably safe work environment. They determined that Foster's own negligence barred any recovery.
The trial court determined that Foster failed to prove any negligent conduct on the part of his employer and we agree. Our review for a negligence claim is the manifest error, clearly wrong standard. Based on the evidence in the record, we find that a reasonable basis exists for the trial court's denial of plaintiff's claim under the Jones Act. Adhering to our rules of manifest error, we find that the trial court's conclusions are supported by the evidence and we will not disturb them.

Primary Duty Doctrine
The defense argues that plaintiff is prohibited from recovering based on "the primary duty doctrine" as discussed in Walker v. Lykes Bros. S.S. Co., 193 F.2d 772 (2nd Cir.1952); and, Peymann v. Perini Corp., 507 F.2d 1318 (1st Cir.1974). They further argue that the continued vitality of the doctrine was noted by our courts in the case of Ronquillo v. Belle Chase Marine Transportation, Inc., 629 So.2d 1359 (La.App. 4th Cir.1993). Under this doctrine, the defense asserts that as captain, plaintiff had the duty of maintaining the vessel in a safe and seaworthy condition. Plaintiff cannot create or permit a dangerous situation to continue and then prevail with a claim for an injury which results from the danger he himself created.
In Walker, plaintiff, the ship's master, sought damages under the Jones Act for an injury that occurred when the drawer of a file cabinet opened during a voyage and struck him in the leg. The trial court rendered judgment for plaintiff, but on appeal the judgment was reversed and a new trial ordered. The appellate court determined that the condition of the drawers was known to plaintiff for nearly four months, and as master, he was charged with the duty of mending the catches. Plaintiff had knowledge of the defect and ample opportunity to correct it, but failed to do so. The court also noted that if the vessel became unsafe during voyage, it was the master's duty to see that the vessel was put in a seaworthy condition at the next port.
Peymann involved a vessel's chief engineer who sought recovery for injuries he sustained on board when he slipped and fell from an oil covered iron railing while attempting to fasten a chain and pulley device to the ceiling of the engine room. The trial court denied relief. The defendant was granted a directed verdict on the negligence count and the jury found for the defendant on unseaworthiness. On appeal the decision was affirmed. The appellate court noted that it was plaintiff's responsibility as chief engineer to maintain proper working conditions and keep the engine rail free from substances such as oil. Plaintiff knew that the cylinder heads had oil on them. Plaintiff *206 chose not to wipe the rail but instead stepped on it.
In Ronquillo, the plaintiff, a captain of a vessel was injured when he slipped on oil located on the vessel's deck plates. Before walking on the oil, plaintiff admitted that he saw the oil and considered walking on the deck plates unsafe, but walked on them anyway. In determining liability, the jury's assessment of 45% to plaintiff was affirmed because he failed to perform his duty to clean the vessel. Further, he walked over deck plates which he clearly saw had oil on them.
While a master or captain's actions may prevent recovery in both Jones Act and unseaworthiness claims, these cases cited by defendants lend no support to their argument that Foster is not entitled to relief. Recovery under the primary duty doctrine is not barred unless the plaintiff is wholly responsible for his injury. Snow v. Boat Dianne Lynn, Inc., 664 F.Supp. 30 (D.Me. 1987); 2 Thomas Schoenbaum, Admiralty and Maritime Law § 6-24 (2nd ed.1994). The facts of this case do not indicate that Foster was entirely responsible for his injuries. We note that the board supported the weight of even the stoutest sailors when first laid for use as a walkway. The board's condition became hazardous only after its deterioration over time. Therefore, fault cannot be entirely attributable to plaintiff when the hazard that caused his injury was not his creation, but the result of the deteriorated condition of a once seaworthy plank. Accordingly, our duty is to weigh the liability of the seaman, employer and vessel owner, and determine the appropriate percentage of fault. The facts of this case show that Foster is not entitled to relief based on Jones Act negligence but that he is entitled to recovery due to the unseaworthiness of the vessel.
Both the trial court and the court of appeal determined that the defendants were not liable for Foster's injuries. While Foster's negligence cannot be ignored, this total bar was error and requires reversal because the vessel owner had an absolute, non-delegable duty to provide a seaworthy vessel. As an appurtenance of the vessel, the board failed under ordinary circumstances. However, any recovery due Foster must be mitigated to the extent of his own negligence. Clements v. Chotin Transportation, Inc., 496 F.Supp. 163 (M.D.La.1980); Villers Seafood Co., Inc. v. Vest, 813 F.2d 339 (11th Cir. 1987). Accordingly, 50% liability is attributable to the plaintiff with the remaining 50% placed on Destin Trading Corporation as owner of the vessel.
Because this court has determined that the vessel was unseaworthy, the owner's liability for Foster's injuries must be addressed. It is more appropriate for the court of appeal to review the evidence and make a damage award. We therefore remand this case to the appellate court for that limited purpose.

DECREE
We reverse the finding of 100% liability on the part of plaintiff. This case is remanded to the court of appeal for further proceedings consistent with the views expressed herein.
REVERSED AND REMANDED.
WATSON, J., concurs in the result and would place some liability on the employer.
LEMMON and MARCUS, JJ., dissent and assign reasons.
VICTORY, J., dissents for the reasons assigned by LEMMON, J.
MARCUS, Justice (dissenting).
I disagree with the majority's reversal of the trial court's finding that Foster failed to prove unseaworthiness under the facts of this case. I would affirm the judgments of the courts below. Accordingly, I respectfully dissent.
LEMMON, Justice, dissenting.
The majority fails to demonstrate any manifest error in the trial judge's factual findings. On the facts found by the trial judge, the boards were not being used for their intended purpose and therefore did not render the vessel unseaworthy.

*207 ON REHEARING
MARCUS, Justice.[*]
On September 5, 1991, Melvin Foster, the relief captain of a tug/push vessel, the M/V LAURA ANN BLESSEY, fell and injured his ankle while attempting to cross between two barges by way of a 2" × 12" × 16' wooden plank. Foster filed this action for damages under 46 U.S.C.App. § 688, commonly referred to as the Jones Act, and general maritime law pursuant to the "saving to suitors" clause against his employer, Blessey Marine Services, Inc. (Blessey) and the owner of the two barges, Destin Trading Corporation (Destin).[1]
The M/V LAURA ANN BLESSEY was docked in Houston, Texas and had two tank barges in tow. The barges were arranged side by side and oil unloading operations were underway. The two barges, WEB 205 and WEB 206, were nearly identical. Both had a four-foot walkway surrounding a flat tank top elevated thirty inches above the walkway. Each tank top had a hatch cover at its midpoint and each end. The tankerman had temporarily placed wooden planks between the barge tank tops close to the location of each hatch cover. WEB 205 and WEB 206 were tightly cabled together leaving no gap at the walkway level and a distance of eight feet between tank tops. Shortly before the accident, two United States Coast Guard officers boarded one of the barges for inspection purposes. Foster, in command of the M/V LAURA ANN BLESSEY as relief captain,[2] set out to join the Coast Guard officers. He attempted to cross from the tank top of one barge to the other by walking across a pressure-treated pine board connecting the two barges. The board broke under his weight and Foster fell thirty inches onto the barge walkway below. The fall severely injured Foster's right foot and ankle and he had to have surgery to repair the damage. Foster weighed 325 pounds at the time of his fall. He was aware of two other possible routes for moving from one barge to the other, but apparently chose to walk across the wooden plank because it was the shortest route.
Before the accident, on July 22, 1991, Foster filled out a supply request for two 2" × 12" × 16' oak boards. Foster's employer, Blessey, approved the order, but had the supplier substitute three pressure-treated pine boards for the requested oak boards. Neither Foster nor the captain ever complained to their employer about the substitution. Company officials testified that they believed the boards were requested for uses such as replacement of worn boards in the forward hold or to support the weight of discharge hoses between the two barges, and not for use as walkways. Further, Blessey officials stated that it was against company safety policy for seamen to use wooden planks for purposes of crossing between tank tops of barges.
A former employee of Blessey, John Riojas, testified that, a few days before the accident, Foster pointed out a crack in one of the boards and advised him not to use it because of safety concerns. Another former employee, Paul Yates, who weighed more than 400 pounds, stated that he stopped using the boards after he heard one of the boards crack under his weight. Yates indicated that he had notified Foster of the problem soon thereafter.
After trial on the merits, the trial judge rendered judgment in favor of defendants Blessey and Destin finding no liability for Foster's injuries under the Jones Act or general maritime law. Plaintiff appealed. The court of appeal affirmed. Upon plaintiff's application, we granted certiorari to review the correctness of that decision.[3] On original hearing, we determined that the trial judge was not clearly wrong in denying plaintiff's claim under the Jones Act. However, we found that the use of the wooden planks as walkways between the two barges rendered *208 the barges unseaworthy. Fault was apportioned with 50% attributable to Foster and the remaining 50% placed on Destin as owner of the barges. Both Destin and Blessey applied for a rehearing. We granted their application to clarify our position on the negligence claim under the Jones Act and to reconsider our position on the general maritime claim for breach of the warranty of seaworthiness.[4]
The Jones Act allows an injured seaman to bring a negligence suit against his employer. 46 U.S.C.App. § 688 (1994). The employer's potential liability extends to all personal injuries arising during the course of the seaman's employment, but proof of negligence is essential to recovery. See id. Such negligence may arise in many ways including the failure to use reasonable care to provide a seaman with a safe place to work, the existence of a dangerous condition on or about the vessel, or any other breach of the duty of care. See Davis v. Hill Engineering, Inc., 549 F.2d 314, 329 (5th Cir.1977); 1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 6-21, at 312 (2d ed.1994). The duty of care owed by an employer under the Jones Act is that of ordinary prudence, namely the duty to take reasonable care under the circumstances. Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 335-36 (5th Cir.1997). The seaman bears the evidentiary burden of proving that a breach of the duty owed by the employer was a cause of his injuries. However, a seaman need only present "slight evidence" that his employer's negligence caused his injuries in order to reach the jury or to be sustained upon appellate review. Id. at 334-35. The employer can introduce evidence of the seaman's own negligence to reduce damages through application of pure comparative fault principles. Like his employer, the seaman must meet the standard of ordinary prudence by acting as a reasonable seaman would act under the same circumstances. Id. at 339.
Melvin Foster asserts that his employer, Blessey, was negligent in its failure to provide a safe passageway from one barge to another barge, failure to provide a safe workplace, failure to provide adequate equipment in proper working order to travel from barge to barge, failure to teach the crew the proper method of doing the work of the vessel, and failure to adopt work guidelines and policies for conducting the vessel's activities. The evidence, however, is contrary to these assertions and fails to establish any unreasonable conduct on the part of Blessey. Foster admitted that there were alternative routes available for crossing between the barges. Foster, weighing 325 pounds, chose to cross by way of a twelve-inch-wide wooden plank temporarily in place between the barges instead of stepping down, or sitting down and lowering himself, thirty inches from the tank top and using a permanent four-foot walkway to get from one barge to the other. Alternatively, he could have avoided the tank top area and used the four-foot walkway to walk around the entire perimeter of the barge before crossing over on the side where the barges were tied flush together. These were clearly safer routes as there was no gap between the barges at the walkway level. Foster testified that it would have taken him only three to four seconds longer to use the first alternative route and ninety seconds longer to cross via the other. This indicates that the alternative routes were equally convenient methods of crossing between the two barges.
Furthermore, Blessey officials stated that there was a company policy that prohibited the use of wooden planks for crossing between barge tank tops. The policy was oral, not written due to the small size of the company at that time. Foster claimed that he had no knowledge of this policy, but testified that he did know that George Jones, vice president of operations for Blessey, did not approve of employees using boards as a method of getting from one barge to the other. Michael Hassett, operations manager of Blessey, testified that upon seeing anyone using boards to make a short route between barges, he would order the boards removed and tell the seamen not to use them for such purposes as it was against company policy.
In addition, there is evidence that Foster was aware of the dangers of using these particular boards as walkways. The tankerman Paul Yates, who weighed more than 400 pounds, testified that he told relief captain *209 Foster that he had stopped using the boards after he heard one of them crack while crossing. Another coworker, Paul Riojas, stated that Foster had told him not to walk on the planks because one of them had a crack in it.
We find no manifest error in the trial judge's conclusion, affirmed by the court of appeal, that Blessey did not breach the duty of care owed to its employee, Melvin Foster. The company provided its employees with a safe passageway for crossing between barges. Foster simply chose to cross in an unsafe manner against established company safety policy. A reasonable seaman weighing 325 pounds, especially one who knew that one of the boards had cracked under the weight of another seaman, would not have believed that the narrow wooden plank could safely support his full weight.
The owner of a vessel has a duty to furnish a seaworthy vessel. This duty is absolute and nondelegable.[5]Florida Fuels, Inc. v. Citgo Petroleum Corp., 6 F.3d 330, 332 (5th Cir.1993). It extends to a defective condition of the ship, its equipment, or appurtenances. Phillips v. Western Co. of North America, 953 F.2d 923, 928 (5th Cir. 1992). A ship's equipment and appurtenances include most objects and things on or attached to the vessel regardless of whether the item belongs to the ship or is brought aboard by a third party. See 1 Schoenbaum, supra, § 6-25, at 333-34.
A breach of the duty of seaworthiness gives rise to a claim for general damages. The plaintiff bears the burden of proving that "the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." Johnson v. Offshore Express, Inc., 845 F.2d 1347, 1354 (5th Cir.1988).
The test for determining unseaworthiness is one of reasonable fitness. The vessel, its equipment, and appurtenances need not be perfect, but all must be reasonably fit for their intended use. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960). Unseaworthiness, then, is a relative term dependent on the circumstances. For example, a valve stem wrapped in duct tape created an unseaworthy condition because it could no longer be opened by hand, the intended method of operation, to regulate the flow of liquid cargo. Gavagan v. United States, 955 F.2d 1016, 1018 (5th Cir.1992). In contrast, an automatic valve that did not close completely did not constitute unseaworthiness when steam and hot water escaped from it and injured a worker. The court determined that its intended purpose was not to safeguard workers from escaping steam, but instead to maintain pressure inside the ship's boiler, and the automatic valve did not have to close completely to perform this function. Jordan v. United States Lines, Inc., 738 F.2d 48, 49-50 (1st Cir.1984).
Generally, a plaintiff's own fault will proportionately reduce his recovery for injuries caused by unseaworthiness. See Matthews v. Ohio Barge Line, Inc., 742 F.2d 202, 204-05 & n. 3 (5th Cir.1984). However, if the seaman's own negligence was the sole cause of his injuries, recovery will be barred. Id. at 204-05; see Kendrick v. Illinois Central Gulf Railroad Co., 669 F.2d 341, 344 (5th Cir.1982). For example, a seaman who misuses otherwise seaworthy equipment cannot recover for his injuries through a claim of unseaworthiness. Little v. Green, 428 F.2d 1061, 1067 (5th Cir.1970).
Foster claims that Destin, owner of the two barges, breached its duty of seaworthiness by requiring him to use the 2" × 12" × 16' boards to cross between the tank tops of the barges instead of providing an adequate walkway. The wooden planks were ordered by Foster and provided by his employer, Blessey, for use on its vessel, the M/V LAURA ANN BLESSEY, and the two barges owned by Destin. Company officials testified that the boards were supplied as equipment for use in supporting the weight of discharge hoses on the barges. The boards were, therefore, part of the equipment and appurtenances *210 of the vessel. It makes no difference that the planks were provided by someone other than the owner of the barges as the duty of seaworthiness is absolute and clearly extends to things brought on a vessel by a third party.
The record reflects that Foster's employer, Blessey, believed that the boards were being requested for purposes other than for use as walkways. Company officials stated that boards such as these were often used for replacing worn boards in the forward hold of a vessel or as a method of supporting the weight of discharge hoses between the two barges. The wooden planks were temporarily placed between the barge tank tops at the time of the accident. Foster was injured while using one of the narrow boards as a walkway. A condition of unseaworthiness exists only if a piece of equipment or an appurtenance is not reasonably fit for its intended use. Foster's use of the plank was outside the scope of its intended uses and, thus, his claim of unseaworthiness must fail.[6] The wooden planks were reasonably fit for uses consistent with their intended uses as replacement boards or as support for discharge hoses.
Although the evidence does not establish any unseaworthiness of the vessel, it does establish that the accident occurred solely as a result of Foster's negligence. In Boudreaux v. Sea Drilling Corp., 427 F.2d 1160, 1161 & n. 1 (5th Cir.1970), the court found that an oil field worker's injuries were caused entirely by his own negligence. The court noted that the worker was in charge of operations on the offshore drilling platform, that he chose to use equipment for purposes other than its intended use, and that he chose an unsafe method of doing his job over safer alternatives. Similarly, Foster was the person in charge of the M/V LAURA ANN BLESSEY and the two barges at the time of the accident. Foster described his duties as including things such as overseeing loading and discharging procedures of the barges, reporting equipment malfunctions, and communicating with the home office. The operations manager, Michael Hassett, stated that Foster was also responsible for safety on board the vessel.
The facts indicate that Foster chose to cross between the tank tops of barge WEB 205 and WEB 206 by means of a narrow wooden plank instead of using an equally convenient four-foot permanent walkway to move from one barge to the other. Such a use of the wooden boards was contrary to the established company safety policy of Blessey, and it was Foster's job to enforce the policy while in charge of the vessel. Moreover, Foster knew that the planks could crack or break under his weight. Two coworkers testified that Foster was aware of a crack in one of boards, and the 400-pound tankerman for the barges told Foster that he stopped using the planks because one had cracked under his weight. In addition, Foster testified that he specifically ordered oak boards because he believed oak was stronger than other woods, and he felt like oak boards would be sufficient to support the weight of someone walking across it. Foster knew that the boards delivered to the M/V LAURA ANN BLESSEY were pine, not oak. Nevertheless, he walked on the pine boards anyway. Like the worker in Boudreaux, Foster elected to use equipment contrary to its intended use, and by doing so, acted in an unsafe manner instead of choosing a safer alternative. Foster's injuries in this situation were caused solely by his own negligence, and therefore, recovery is barred. Accordingly, the trial court judge was not clearly wrong in finding no breach of the duty of seaworthiness on the part of vessel owner Destin. The court of appeal correctly affirmed.

DECREE
For the reasons assigned, the judgment of the court of appeal is affirmed.
JOHNSON, J., dissents and assigns reasons.
CALOGERO, C.J., dissents and will assign reasons.
*211 JOHNSON, Justice, dissenting.
In our original opinion, Foster v. Destin Trading Corp., 695 So.2d 509 (La.1997), the majority determined from the evidence that the pine board was an appurtenance of the vessel, that the pine board deteriorated over time and was not fit to be used as a means of traversing from vessel to vessel, thereby rendering it unseaworthy. I am still of the opinion that an unseaworthy condition existed on the vessel at the time of Foster's injuries which clearly exposed the vessel's owner to liability.
NOTES
[*] J. Kimball was on panel. Rule IV, Part 2, § 3.
[1] Prior to trial, Foster's wife, Mrs. Lou Foster voluntarily dismissed her claim for loss of consortium. Miles v. Apex Marine, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990) and its progeny say clearly there is no recovery by parents, spouses or children for loss of society in a general maritime action for wrongful death or injury to a Jones Act seaman.
[2] See Foster at 1347.
[3] Id. at 1348-49.
[4] Haskins v. Point Towing Co., 395 F.2d 737 (3rd Cir.1968), appeal after remand 421 F.2d 532 (1970); Romero v. International Terminal Operating Co., 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959), rehearing denied 359 U.S. 962, 79 S.Ct. 795, 3 L.Ed.2d 769 (1959).
[5] Plaintiff's action was filed in the 24th Judicial District Court for the Parish of Jefferson.
[6] The case was argued in December, 1902 and decided on March 2, 1903.
[7] In FN1, it states that pursuant to the Longshoreman's and Harbor Workers Compensation Act Amendments of 1972, vessels no longer owed a duty of seaworthiness to longshoremen. The amendment had prospective application only and did not apply to this case. Id. at 866.
[8] See deposition of Yates at p. 27.
[*] Kimball, J. not on panel. Rule IV, Part 2, § 3.
[1] A claim for loss of consortium damages by plaintiff's wife, Lou M. Foster, was voluntarily dismissed prior to the commencement of the trial.
[2] The captain was not on the vessel on September 5, 1991 and Foster, as relief captain, was in command of the vessel.
[3] 96-0803 (La.6/7/96), 674 So.2d 987.
[4] 96-0803 (La.5/30/97), 700 So.2d 199.
[5] Since the owner's duty to maintain a seaworthy vessel is absolute and nondelegable, it extends even to conditions of unseaworthiness created by third parties without any knowledge on the part of the owner. Blassingill v. Waterman S.S. Corp., 336 F.2d 367, 370 (9th Cir.1964).
[6] A captain's knowledge as an agent will normally be imputed to the owner of the vessel. But in the present situation, Foster cannot impute his knowledge regarding the use of the planks as walkways to Destin in order to seek recovery for his own injuries.