11 EDWIN A. LOMBARD, Judge.
This is an appeal of a judgment awarding damages under the Jones Act and general maritime law for the injuries suffered by a deckhand employed by Delta Queen Steamboat Company occasioned in the course and scope of his work while assisting in the mooring of the boat in Memphis, Tennessee.

STATEMENT OF FACTS

Sean George, appellee/plaintiff, was injured on August 27, 1998 during a routine landing in Memphis, Tennessee at Beale Street. The Beale Street landing is the Delta Queen’s normal landing location in Memphis. He had been working for Delta Queen for approximately a year, as a dishwasher for much of that time. He had participated in several landings at the Beale Street landing previously.
To accomplish the landing that resulted in the accident, several deckhands, including Mr. George, went onto the levee to receive the vessel’s mooring lines for the purpose of securing the vessel. During his attempt to secure the vessel, Mr. George became stuck in the mud up to his thighs and sustained a serious lower back injury that required surgeries and left him with some permanent disability.
| ¡/The lead deckhand of that operation, Teron Spencer, confirmed that he witnessed Mr. George get stuck in the mud on the bank of the river as the latter approached the heaving line that Mr. Spencer had thrown onto shore. Mr. Spencer further testified that the water level was low that day and that the mud on the bank, which the river had recently covered, looked hard — it appeared as mud *478 that had dried out. Mr. Spencer had worked for Delta Queen for approximately four years at the time of trial and testified that he also had experienced trouble in the mud during landings previously.
Mr. Spencer testified that he had thrown Mr. George the spring line, which landed about 40 feet out. He witnessed Mr. George walk toward the line to reach it and then saw him start to sink down in the mud. The two other deckhands on the shore, Ronnie Anderson and Mike Bowers, helped Mr. George get out of the mud by using another line, a heaving line.
Mr. Spencer testified that there is another way to get the mooring line out to the deckhands: walking the line down the stage, or gangplank, while holding onto the handrail. The stage is approximately seven feet wide by 60 feet long. That method is difficult, however, because the stage is moving as the deckhand walks down, although there is a handrail on the side of the stage that can be grasped while carrying the heavy line in the other hand.
Additionally, Mr. Spencer testified that he had only received on-the-job training in landing techniques and that there was no training specifically geared toward what to do about mud on the shore. Moreover, during the landing in 13question, there was no warning issued by anyone concerning the river level being recently lowered and the possibility or probability of the mud being soft underneath the apparently-hard surface.
Mr. George testified that when the line was thrown to him, it went over his head a bit and, as he reached up for it, he sank into the ground that he suddenly had been standing on; ie., the seemingly-solid ground gave way with his upward bodily motion, although he testified that he did not actually jump up to catch the line.
Subsequent to the accident, Mr. George had a series of three epidurals performed. He also had MRIs and x-rays taken of his back. Both the independent medical examiner and his treating physician testified that he had a significant herniated disk at L5-S1, which was resulting in a pinched lumbar nerve root. Then, at the recommendation of his treating physician, Mr. George underwent a percutaneous diskec-tomy surgery. For a period of time, the pain lessened, but eventually returned and Mr. George had a second surgery — a lami-nectomy, followed by physical therapy. He returned to work for awhile, but not as a deckhand. He worked as a delivery person for a food business, but after a few weeks, the regular motion of getting in and out of his car with the food orders began irritating his back and he started having constant pain again.
Since the accident with the Delta Queen, Mr. George experienced two car accidents. Both were minor and neither accident produced injuries, according to his testimony.
[¿The master (captain) of the Creole Queen, Captain Albert James Christian, qualified as an expert in navigation and operation of the Mississippi River motor vessels that make riverbank landings. Captain Christian explained that the Creole Queen and the Delta Queen were similar in design and in the nature of their work, both being paddle-wheel driven and both carrying passengers. Additionally, both boats have similar boarding structures, including gangways and stages. Although the Creole Queen does not routinely make landings, it has done so over the past 15 years since Captain Christian has served as its master (beginning in 1986).
Captain Christian had been asked to review and provide opinions relative to the Delta Queen accident involving Mr. George. The procedure used by the Delta Queen, of throwing the line ashore to the *479 deckhand, is the same procedure as that used by the Creole Queen. Captain Christian also had experience with landings at the Beale Street landing, specifically, and concluded that it was generally a fairly safe place to land the boat.
On direct examination, Captain Christian also testified that he believed the procedure utilized by the Delta Queen— throwing the heaving line — was safer than the alternative method of walking the line down the stage. Upon cross-examination, however, he acknowledged that he rarely has performed the stage method, and that the Delta Queen lands one out of every three or four times via the stage method. Therefore, Captain Christian acknowledged that, under certain circumstances, it might be more appropriate to walk the line out rather than throw it out.
Another expert testified in the area of safe operation and navigation of motor vessels, Frank M. Buck. Mr. Buck has over 40 years experience in the maritime industry and, until 1998, held a 500-ton master license, among other licenses Irrelative to operating vessels. Mr. Buck testified on direct that he believed the stage method was safe for deckhands to use if conducted properly and that some circumstances dictated the use of that method. When questioned concerning what the normal procedure would be when getting ready to land a boat in a situation as that presented at the Beale Street landing that particular time, Mr. Buck responded:
Normally you’d have — whoever’s going to be in charge — and this boat having this many mates, it would be the mate’s job to have a brief meeting prior to making the landing even though it’s the same landing area you’ve made many times. And based on my experience in the towboat business, trying to get out on the bank various means and ways when you know that a certain area has been underwater for a period of time, it’s very likely it’s gonna be awfully muddy.
Mr. Buck also testified about the grade of the ground in that area based upon the river having been receding at a fairly fast rate before the landing. In fact, Mr. Buck’s review of the Army Corps of Engineers’ river stages information indicated that the river in that location had been under water for a long time and only out from under water for a week or two at the time of the landing at issue. He stated that this is the type of information a river boat captain would want to know prior to effecting a landing and that captains have ready access to such information. Mr. Buck opined as follows with direct questioning:
Q: Is this the type of information that the captain would want to have before attempting a landing such as this, a bank landing?
A: Well, in my opinion, he should have that information before he ever arrives at the area.
Concerning the condition of the river bank following the river’s falling over a short period of time as was the case in the instant situation, Mr. Buck testified:
Q: Based upon your experience on the river, when the water recedes, what happens to the ground? Does it dry?
A: Yes.
DQ: Do you know if it dries through and through?
A: No, I don’t.
Q: In fact, that’s one of the problems, isn’t it, that you don’t know how dry it is, that there may be soft mud underneath a thin crust?
A: That is correct.
Q: Is this something that a captain should take into consideration in at *480 tempting a bank landing, considering that deckhands may be asked to go out onto that bank?
A: I think he should. And evidently somebody should have been aware of that, ‘cause after all, they had a 60-foot stage.
Q: Under these conditions where the river was falling this fast, was it safe to use the heaving line method to get that line out there to the deckhand?
A: It would be a lot safer to walk it out on the stage like I had said earlier, in my opinion.
The first mate of the Delta Queen, Larry Wilkinson, was unavailable during the beginning of the trial; thus, his deposition testimony was admitted in lieu of his ap-. pearance despite defense counsel’s later attempts to have him testify when he returned to town. In his deposition, Mr. Wilkinson explained that he had become promoted to first mate around 1989, but had worked for Delta Queen and for the Mississippi Queen since 1982.
On the date of the accident, Mr. Wilkinson worked a normal twelve-hour shift: 5:30 p.m. to 5:30 a.m. David Hardesty, the second mate, served as relief for the opposite twelve-hour shift ending at 5:30 p.m. Mr. Wilkinson testified that the accident occurred approximately a half hour after his shift had ended: around 6:00 p.m. that evening. Mr. Wilkinson did not see Mr. George sink into the mud, but did witness them pulling him out because he was maintaining the stage. Mr. Hardesty, who was on duty at the time, had left the bow because the batteries in the 17radio needed to be replaced and he asked Mr. Wilkinson to supervise the landing from the bow in his absence. Mr. Wilkinson watched the line being thrown to Mr. George, but did not see what happened after that time until the other deckhands were pulling him out of the mud. Mr. Hardesty returned shortly after retrieving the radio batteries. Finally, Mr. Wilkinson testified that there were no discussions relative to safety concerns when docking in the mud on the riverbank.
David Hardesty testified at trial that he had been employed by Delta Queen Steamboat Company since April 1995 when he entered the maritime field. He became a second mate in 1998, but was the head deckhand on a different boat, the American Queen, prior to promotion as second mate and a transfer to the Delta Queen in the summer of 1998.
At the time of Mr. George’s accident, Mr. Hardesty had only been second mate on the Delta Queen for a couple weeks. The American Queen and the Delta Queen were substantially different boats: the former was a much larger vessel and the Delta Queen was a steamboat. Mr. Har-desty testified that the procedure for landing the two boats was essentially the same: generally using the heaving method. He had participated in approximately 20 landings at the Beale Street area prior to the accident.
Mr. Hardesty testified that on the night of the accident, although the shift had changed and he was technically in charge of the landing, he had to leave the deck briefly to replace his radio’s battery so that he could stay in touch with the captain or the man on the stern during the landing. He asked the first mate who was standing nearby on the bow to watch the landing in his absence. Mr. Hardesty did not see any problems associated with the landing at the time he asked Mr. Wilkinson to watch the landing procedure. By the time that Mr. Hardesty returned |sto the bow (about five minutes later), the accident had already occurred. He did not receive a briefing on the accident, which frustrated him. Mr. Hardesty did not re *481 call Mr. Wilkinson being on the bow upon his return.
Mr. Hardesty acknowledged that at the Beale Street landing, which is called a graded bank, for every foot that the river declines, it exposes about six feet of the bank. He also testified that the decision to use a particular method of getting the line to the shore purposes of securing the vessel often is made by the deckhands themselves, although the mates have supervisory authority and had the responsibility to warn the deckhands if the mates saw them getting into a troublesome situation on the shore.
One of the deckhands on duty with Mr. George the evening of the accident, Ronnie Anderson, testified at his deposition on May 22, 2000 that the line thrown to Mr. George was only about 15-20 feet long, but at trial he testified that it was around 70 feet long. He could not explain the difference in his testimony at deposition (nearly a year prior to the trial) and at trial.
Mr. Anderson stated that he observed Mr. George walking about five to ten feet towards the river to get to the heaving line after the latter got off the gangplank. Mr. Spencer had thrown the line, but it had not reached Mr. George. Mr. Anderson pulled Mr. George out of the mud using another heaving line that someone threw to him from the bow. Mr. Anderson stated that it took him approximately five to ten minutes to pull Mr. George out of the mud and during that time, he did not see either of the mates. Mr. Anderson testified that Mr. George took several steps toward the line and kept sinking more and more into the mud. He also testified, however, that Mr. George was standing still waiting for the rope to be thrown before he got stuck in the mud.
|aOn re-direct, plaintiffs counsel again impeached the witness with his prior deposition testimony that had been given a year earlier. In that deposition, Mr. Anderson testified that Mr. George had already reached the heaving line when he began sinking, but at trial he stated that Mr. George had not yet reached the line when he sank. Again, Mr. Anderson offered no explanation for his contradictory testimony.
The captain serving as master of the Delta Queen, Gabriel J. Chengery, also testified. He was in charge of the landing during which Mr. George was injured. Although Captain Chengery did not see the entire accident occur, he did see Mr. George sink into the mud up to his knees, as he recalled.
Captain Chengery also clarified that the decision to use the heaving line method as opposed to the stage method is made by the first mate, not the captain, during the landing. He stated that, as first mate, Larry Wilkinson “is aware that a lot of times the grading on these bank landings is so severe that even the 60-foot gangplank sometimes doesn’t even reach the water line where the water meets the dry land. And so sometimes it’s not practical to throw that line off the bow because the boat’s so far from dry land. So, I could understand where he may say one out of every three [the line is walked across the stage].” Captain Chengry finished by stating that in the Memphis landing at issue, the boat could arrive closer to the shore to be able to use the heaving method.

PROCEDURAL HISTORY

The case was set for a bench trial on May 30, 2001. Close to that date, defendant filed a Motion to Continue alleging that one of its witnesses-employees, Mr. Larry Wilkinson, was out of the country and, therefore, a continuance was 1 innecessary. The trial court admitted Mr. Wilkinson’s deposition. Although a re *482 quest was made to hold the record open, such request was denied by the trial court.
The trial commenced on May 30th and continued through May 31st. The trial finally concluded on June 11, 2001.
On July 17, 2001, the court found that the defendant was hable in negligence under the Jones Act and that the Delta Queen was unseaworthy. The court entered judgment in favor of Mr. George and against defendant awarding general damages of $450,000.00 and special damages of $797,889.00 itemized as follows: (1) past lost wages — $40,733.00; (2) past employer meal costs — $8,408.00; (3) future wages— $231,824.00; and (4) fringe benefit contributions — $66,884.00.
Defendant appealed the damages awards and plaintiff cross appealed the trial court’s failure to award future medical expenses.

ANALYSIS

Applicant asserts that the trial court used the incorrect legal standard for determining negligence under the Jones Act; therefore, a de novo review of this record was conducted.
The trial court referred to “slightest negligence” as sufficient to sustain a finding of Jones Act liability, and stated that the plaintiffs burden to show causation is “featherweight.” The court cited Milstead v. Diamond M. Offshore, Inc., 94-1582 (La.App. 3 Cir. 9/6/95), 663 So.2d 137, writ granted, 95-2446 (La.12/15/95), 664 So.2d 440, aff'd in part, rev’d in part, 95-2446 (La.7/2/96), 676 So.2d 89.
Federal jurisprudence in 1997 clarified that seamen in Jones Act negligence cases are bound to the standard of ordinary prudence, not to a lesser standard of In care; ie., according to the court, Jones Act seamen are required to act as reasonable seamen under the circumstances. Similarly, Jones Act employers are not held to a higher standard of care than ordinary negligence, but are required to act as reasonable employers under the circumstances. Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331 (5th Cir.1997). Inconsistent federal jurisprudence was overruled by that decision.
A year later, the Louisiana Supreme Court adopted the above standard concerning Jones Act negligence enunciated in Gautreaux and stated:
The duty of care owed by an employer under the Jones Act is that of ordinary prudence, namely the duty to take reasonable care under the circumstances. The seaman bears the evidentiary burden of proving that a breach of the duty owed by the employer was a cause of his injuries. However, a seaman need only present “slight evidence” that his employer’s negligence caused his injuries in order to reach the jury or to be sustained upon appellate review. The employer can introduce evidence of the seaman’s own negligence to reduce damages through application of pure comparative fault principles. Like his employer, the seaman must meet the standard of ordinary prudence by acting as a reasonable seaman would act under the same circumstances.
Foster v. Destin Trading Corp, 95-226 at pp. 3-4 (La.5/30/97), 700 So.2d 199, 208 (on rehearing) (citations omitted).
Additionally, the court in the same case reiterated the standard for unseaworthiness:
The owner of a vessel has a duty to furnish a seaworthy vessel. This duty is absolute and nondelegable. It extends to a defective condition of the ship, its equipment, or appurtenances. A ship’s equipment and appurtenances include most objects and things on or attached to the vessel regardless of whether the *483 item belongs to the ship or is brought aboard by a third party.
Id. at p. 5-6, 700 So.2d at 209 (citations omitted).
Moreover, a crew that is inadequately trained or not sufficiently instructed in the use of the vessel’s equipment, or a crew that engages in unsafe methods of l^work has been considered to constitute unseaworthiness as well. See, e.g., Phillips v. Western Co. of North America, 953 F.3d 923 (5th Cir.1992).
Although the trial court may have used the incorrect case law and articulated the negligence standard inartfully, the factual findings are more than adequate to support the lower court’s determination of negligence on the part of Delta Queen. The captain and mates of the Delta Queen had a duty to evaluate and anticipate the likelihood of problems associated with the landing; i.e., the possibility of mud being soft underneath, which could pose a hazard for the deckhands on shore trying to retrieve the heaving line when thrown from the ship. An alternative method existed that would have been safer for the deckhands given the condition of the recently-dried mud on the bank, which information was readily available to the captain and mates of the vessel. The crew was familiar with the stage method where the line could be walked down to shore. Although that method has risks associated with it, too, under the circumstances with the river having recently receded within that last two weeks, it seems that the captain and mates might have opted for the stage method to avoid the possibility of injury to the deckhands if they got stuck in the riverbank mud.
Mr. George has no comparative negligence; his actions were consistent with those of deckhands on shore retrieving heaving lines to secure the boat. His •testimony is credible and logical, whereas Mr. Anderson’s testimony (that Mr. George kept walking forward into the mud) is not credible or logical. Also, the latter witness was impeached twice at trial. The trial court was correct in its credibility determinations and committed no reversible error in its conclusions regarding the negligence issue.
1,3Additionally, the trial court was correct in its determination that the Delta Queen was also unseaworthy based on its lack of adequate training, equipment, and safety procedures at the time of the accident. There was inadequate briefing and/or preparation of the crew prior to the landing in a situation that, under the specific circumstances that day, was risky.
Due to the above determinations, we need not reach the additional assignments of error raised by appellant.
Mr. George also appealed asserting that the trial court erred in failing to award damages for future medical care. Future medical expenses constitute a legitimate aspect of recovery even though the exact amount is not absolutely certain. Bly v. Prudential Prop. & Cas. Ins., 589 So.2d 495 (La.App. 5th Cir.1991). For purposes of our review of the trial court’s judgment regarding future medical expenses, we must ascertain whether the lower court abused its discretion in failing to award any damages for future medical expenses.
The record reflects that Mr. George’s treating physician, Dr. Bernard L. Manale, testified that Mr. George may need future medical treatment depending upon whether or not his condition worsens. When asked to give his prognosis for the future relative to Mr. George’s medical needs, Dr. Manale responded: “I think his prognosis is guarded. He’s not gonna [sic] have the pain that he had before his surgery. But *484 he’s gonna [sic] have to watch what he does.” Dr. Manale elaborated on certain activities that Mr. George might have to avoid, which require certain back movements; e.g., “repetitive squatting, bending, working in cramped positions ..., etc.”
Additionally, when asked about what follow-up treatment was indicated for Mr. George, Dr. Manale explained that additional tests, such as MRIs or EMGs, 114would not be necessary unless they were necessary for ongoing treatment at that time; “[I]f he’s stable, symptoms haven’t progressed, we might not need those tests.” Concerning his pain, Dr. Manale stated that although Mr. George was currently stable, if his condition worsened, he would have to be seen in the office every three months if he were taking Vicodin.
Dr. Manale’s summary regarding the approximate future cost of Mr. George’s medical expenses was speculative. He testified:
So, his medical bills will be a thousand dollars, maybe a little bit more than that, a year. And I cannot tell you how many years he’ll have to come see me. I jus.t have no way of knowing. It might be two years. It might be five. It might be less. I don’t know.
Given the uncertain nature of the expert’s testimony, we cannot find that the trial court committed manifest error in failing to award a specific amount for future medical damages. Therefore, we will not disturb this aspect of the judgment.

CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

AFFIRMED.