760 So.2d 1243 (2000)
Tomas Reyes CABAHUG, Jr.
v.
TEXT SHIPPING COMPANY, LTD.; Apollo Shipping Ltd.; and United Kingdom Mutual Steam Ship Assurance Association (Bermuda) Ltd.
No. 98 CA 0786.
Court of Appeal of Louisiana, First Circuit.
May 12, 2000.
Rehearing Denied July 7, 2000.
*1246 Richard J. Dodson, David C. Vidrine, Baton Rouge, Gordon R. Crawford, Gonzales, for Plaintiff/Appellee, Tomas Cabahug, Jr.
Scott A. Soule, Robert B. Fisher, New Orleans, for Defendants/Appellants, Text Shipping Co. Ltd. and the United Kingdom Mutual Steam Ship Assurance Association (Bermuda) Ltd.
Before: LeBLANC, PETTIGREW, JJ., and KLINE,[1] J. Pro Tem.
KLINE, J. Pro Tem.
This is an appeal of a judgment awarding $1,213,161.47 in damages to a Filipino seaman in a maritime personal injury case.

BACKGROUND AND PROCEDURAL HISTORY
On December 8, 1995, Tomas Reyes Cabahug Jr. (Cabahug), a Filipino seaman, was seriously injured when he fell into the Mississippi River from an accommodation ladder attached to the M/V NIKI. At the time of Cabahug's fall, the M/V NIKI was undergoing loading operations in Darrow, Louisiana. Cabahug instituted a maritime personal injury action under the Jones Act, 46 U.S.C. § 688, and general maritime law, against Text Shipping Company Ltd. (Text), a Cyprus corporation and owner of the M/V NIKI; Apollo Shipping Ltd. (Apollo), a Malta corporation, which agreed to provide crews to Text; and United Kingdom Mutual Steam Ship Assurance Association (Bermuda) Ltd. (United *1247 Kingdom), the maritime insurer of Text. The suit was filed in the Twenty-Third Judicial District Court of Louisiana under the "Savings to Suitors" clause, 28 U.S.C. § 1333. Cabahug alleged he was injured due to the negligence of the defendants and the unseaworthiness of the vessel. In addition to contesting their liability, defendants asserted Cabahug's claim should be dismissed because his employment contract contained an exclusive forum selection clause, which required his claim be heard in the Philippines.
The defendants filed numerous exceptions seeking dismissal of Cabahug's lawsuit. The exceptions included declinatory exceptions raising the objections of insufficiency of citation, insufficiency of service of process, improper venue, lack of jurisdiction over the person of the defendants, lack of subject matter jurisdiction, prematurity, want of amicable demand, and peremptory exceptions raising the objections of no right and no cause of action.
The defendants sought supervisory writs from this court for review of the denial of their exceptions. This court stayed the litigation, ordered the record lodged, and docketed the matter for oral argument. However, before arguments could be heard, the Louisiana Supreme Court vacated the stay order, and remanded the case to the trial court. The supreme court found no error in the trial court's denial of the exceptions and stated that defendants had adequate remedy on appeal. Cabahug v. Text Shipping Company, Ltd., 96-2580, p. 1 (La.11/1/96), 681 So.2d 345, 346.
Prior to trial, the defendants moved for summary judgment on the basis that the exclusive forum selection clause in Cabahug's employment contract required this action be heard in the Philippines. The motion for summary judgment was denied. A similar motion in limine was also denied.
After trial on the merits, the trial court determined Cabahug's employment contract was not the Philippine Overseas Employment Agency (POEA) contract (Defense Exhibit 51), but that the shipping articles (Defense Exhibit 12) served as Cabahug's contract of employment. The trial court found defendants to be 100% at fault in causing Cabahug's accident, and awarded Cabahug $1,213,161.47 in damages. Defendants appealed, contending the trial court erred in failing to enforce the exclusive forum selection clause of Cabahug's contract of employment, applying the improper legal standard of care, casting Text liable for any percentage of fault, finding Text negligent, awarding excessive damages, and awarding maintenance and cure and "found."
The first issue we encountered was whether a forum selection clause contained in Cabahug's employment contract should be enforced. Because of the complete absence of evidence in the trial record regarding whether Cabahug's claim is barred from being presented in a Philippine forum, this matter was remanded back to the trial court for the taking of additional evidence on that issue. See Cabahug v. Text Shipping Company, Ltd., 98-0786 (La.App. 1st Cir. 12/28/98), (not designated for publication). The trial court conducted a hearing on that issue and the record has been supplemented with that evidence.

Enforcement of the Forum Selection Clause
The seminal case on interpretation of forum selection clauses is MIS Bremen v. Zapata Off-Shore Company, 407 U.S. 1, 15, 92 S.Ct. 1907, 1916, 32 L.Ed.2d 513 (1972), which held that a forum selection clause should control absent a strong showing that it should be set aside. By placing the burden of proof on the party contesting enforcement, the Supreme Court effectively made the forum selection clauses prima facie valid. See Bremen, 407 U.S. at 15-18, 92 S.Ct. at 1916-17.
Forum selection clauses can be invalidated if enforcement is shown to be unreasonable and unjust. The Bremen court referred to several examples of what would qualify as situations deemed unreasonable under the circumstances. Enforcement *1248 is considered unreasonable if trial in the contractual forum would be so gravely difficult and inconvenient that a party will for all practical purposes be deprived of his day in court. Bremen, 407 U.S. at 12-13, 16-17, 92 S.Ct. at 1914-17.
Prior to the presentation of testimony, the defendants offered a stipulation that they would agree to appear and defend any claims for damages whether in contract or tort, brought by the plaintiff in the proper tribunal in the Philippines. The defendants agreed that this would include any damage claim made by Cabahug arising from his accident on board the M/V NIKI.[2] The defendants also agreed to waive any objections regarding prescription, statutes of limitation, venue, jurisdiction, or other procedural impediment. According to the stipulation the defendants agreed that the district court deposition testimony of witnesses and related exhibits would be made available to the proper Philippine tribunal with parties reserving any right to call the same or additional witnesses and offer additional exhibits. Finally, the defendants agreed to pay any judgment or award rendered by the proper Philippine tribunal or settlement.
Cabahug offered testimony from Emilio A. Gancayo, a former associate justice of the Philippine Supreme Court, who was accepted as an expert in Philippine law and procedure. According to Justice Gancayo, the prescriptive periods in the Philippines are three years from the date of incident to institute an action arising out of an employer-employee relationship and four years from the date of injury to file a tort claim seeking damages in a Philippine district court.
Considering that Cabahug's injury occurred on December 8, 1995, his claims are clearly prescribed. Despite the stipulation offered by the defendants, Justice Gancayo testified that there was no mechanism for a Philippine tribunal to accept the waivers offered by the defendants. On cross-examination, Justice Gancayo conceded that he knew of no mechanism that would prohibit the implementation of the aspects of the offered stipulation.
The defendants offered testimony from Ambassador Raul Goco, the former Solicitor General of the Philippines, who was also accepted by the court as an expert in Philippine law and procedure. Ambassador Goco testified that a Philippine court would indeed accept the stipulation and waivers offered by the defendants. Although Ambassador Goco cited authority for extra-territorial service over non-resident defendants, his trial testimony did not give any authority to accepting the stipulation offered by defendants.
Cabahug's claims are now barred by prescription in the Philippines, yet there is no agreement among the legal experts as to whether the stipulation offered in the trial court waiving objections such as prescription could be enforced and recognized by a Philippine tribunal. Enforcement of a forum selection clause under these circumstances would be based on speculation. Accordingly, we decline to enforce the forum selection clause contained in Cabahug's contract of employment, and address the remainder of the issues raised by the defendants.
We had previously determined that the trial court erred in its determination that the shipping articles constituted Cabahug's employment contract. In our initial review, we found that the POEA contract should have been considered as Cabahug's employment contract. See Cabahug v. Text Shipping Company, Ltd., et al, 98-0786, pp. 4-5 (La.App. 1st Cir. 12/28/98) (not designated for publication). Because the trial court's error of law concerned only those issues regarding what qualified as Cabahug's employment contract, our prior opinion in this matter reviewed those *1249 issues de novo. However, all other factual findings will be reviewed under the manifest error standard. See Thorn v. Caskey, 32,310, p. 7 (La.App. 2nd Cir.9/22/99), 745 So.2d 653, 659.

FACTS
Cabahug was employed as an Able-Bodied (AB) seaman on board the M/V NIKI. The M/V NIKI had arrived at Darrow, Louisiana, in the early evening of December 7, 1995. Loading operations began in the evening, while the vessel was moored in the Mississippi River. The cargo, which consisted of grain, was loaded onto the vessel by a floating crane. The crane was located on a derrick barge, which was tied to the M/V NIKI's portside. One of the warping wires used to tie the derrick barge to the vessel was tied in a location that interfered with the use of the portside accommodation ladder.
On the morning of December 8, while the loading operations were still being conducted, the crew of the M/V NIKI was attempting to raise the portside accommodation ladder. Because of the possibility that the warping wire could cause the accommodation ladder to snag, the bosun, Noel Sarillana, ordered Cabahug to descend the ladder and make sure the warping wire did not come in contact with the ladder. Cabahug descended the ladder, and attempted to keep the wire free by kicking it away with his right foot. Suddenly, the ladder jerked and Cabahug fell approximately twenty feet into the Mississippi River. He sustained serious injuries and was transported by helicopter to Our Lady of the Lake Regional Medical Center (OLOL) in Baton Rouge.
Cabahug's lawsuit charged that the defendants were liable for his injuries because they had committed Jones Act negligence and the vessel was unseaworthy. After trial on the merits, the trial court found that the defendants were liable under the Jones Act and that the M/V NIKI was unseaworthy.

Standard of Care
The Jones Act allows an injured person to bring a negligence suit against his employer. 46 U.S.C.A. § 688. The employer's potential liability extends to all personal injuries arising during the course of the seaman's employment, but proof of negligence is essential to recovery. Such negligence may arise in many ways including the failure to use reasonable care to provide a seaman with a safe place to work, the existence of a dangerous condition on or about the vessel, or any other breach of the duty of care. Foster v. Destin Trading Corporation, 96-0803, p. 3 (La.5/30/97), 700 So.2d 199, 208 (on rehearing).
Defendants argue that the trial court erred as a matter of law by applying an improper legal standard in evaluating Cabahug's claims of Jones Act negligence.[3] In its reasons for judgment, the trial court relied on Ceja v. Mike Hooks, Inc., 690 F.2d 1191 (5th Cir.1982), for the concept that a seaman only has a slight duty to exercise reasonable care to protect himself. As the defendants point out, the United States Fifth Circuit Court of Appeals overruled Ceja and clarified that under the Jones Act, both the employer and the seaman must follow a standard of "reasonable care" and "act with ordinary prudence under the circumstances." Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 336-39 (5th Cir.1997). The Fifth Circuit specifically overruled a prior line of cases that had imposed a higher standard of care on the employer while asserting only "a slight duty of care to the seaman." Gautreaux, 107 F.3d at 337-39. The Gautreaux court found:
A seaman, then, is obligated under the Jones Act to act with ordinary prudence *1250 under the circumstances. The circumstances of a seaman's employment include not only his reliance on his employer to provide a safe work environment but also his own experience, training, or education. The reasonable person standard, therefore, under a Jones Act negligence action becomes one of the reasonable seaman in like circumstances. To hold otherwise would unjustly reward unreasonable conduct and would fault seaman only for their gross negligence, which was not the contemplation of Congress.
107 F.3d at 339.
Because the trial court's reasons for judgment indicate that Cabahug was only charged with a slight duty of care, we must examine the facts using the proper standard of care articulated in Gautreaux.
The record indicates that the derrick barge, which supported the loading crane, had been moored to the M/V NIKI on the evening of December 7, 1995. One of the warping wires, which was used to tie the barge to the vessel was tied aft of the portside accommodation ladder on the vessel. The warping wire actually ran between the accommodation ladder and the portside of the ship. The configuration of using warping wires to tie the barge to the ship allowed the derrick barge to move from one cargo hold to another by a tightening and slacking of the wires. The stevedores on the derrick barge controlled the tightening and slacking of the warping wires.
On the evening of December 7, before loading operations commenced, the stevedore foreman spoke with the chief officer, Mustafa Nabelsy,[4] regarding the location of the warping wire. The foreman explained that the crane on the derrick barge caused the barge to move during loading operations. The movement of the barge tightened the warping wires and created a risk that the accommodation ladder could be damaged. The stevedore foreman asked that the accommodation ladder be raised and kept away from the wire. However, with people boarding and leaving the vessel, the ladder was still used, which made it a problem for the stevedores since it took twenty minutes to lower and raise the ladder.
Sometime after midnight on the morning of December 8, the duty officer informed Nabelsy that the ladder was moving too slowly, and could be damaged by the warping wire. The starboard ladder was not available for use due to loading operations. Nabelsy instructed that the ladder be rerigged with an additional runner wire attached to another winch motor that would allow the ladder to be moved at a faster rate. The normal rate for the ladder to move was approximately one meter per minute.
On the morning of the accident, the ladder had been struck or entangled in the warping wire at least three times. On each of these occasions, Cabahug was instructed by the bosun, Noel Sarillana, to descend the ladder and free the ladder from the wire. Cabahug did this by holding on to the handrails of the ladder and kicking the wire away with his foot, so that the wire would not come in contact with the ladder. At approximately 9:20 a.m., as Cabahug again descended the ladder to prevent the warping wire from entangling the ladder, the ladder jerked and he fell approximately twenty feet into the Mississippi River. Cabahug testified he had both hands on the handrails while he was on the ladder.
Sarillana and an AB seaman, Rocque Agase, who was operating one of the air motors used to raise the ladder, both testified that the ship's wires attached to the ladder itself did not catch or snag, nor was there any kind of equipment malfunction. However, neither Sarillana nor Agase saw the warping wire at the time Cabahug fell. Agase was not in a position to observe Cabahug as he stood on the lower part of *1251 the ladder and Sarillana testified that he had diverted his attention away from Cabahug for approximately one minute and did not see what caused Cabahug to fall.
Cabahug's marine safety expert, Ronald Campana, testified that when a man is working overboard on the side of a vessel, he must have a flotation device and a safety harness with a line independently attached to the vessel. Campana testified that the warping wire could have been tied at a different location, away from the accommodation ladder so as not to come in contact with the ladder. The record indicates that the chief officer of the vessel has the final say regarding where the warping wires would be tied to the vessel. According to the deposition of Nabelsy, he had asked the stevedore foreman to move the warping wire prior to this incident, but the stevedore foreman refused on the basis that moving the wire would not allow the barge to be secured as well.
Cabahug testified that he did not use a safety harness because of time pressure; it would have taken five minutes to get the safety harness. Captain George Lyras testified that Cabahug did not need the harness because the safety line would have passed under the vessel's hangers, which was very dangerous because it would have created an opportunity for entanglement of the safety line. Further the defendant's own safety expert, Ian Cairns, testified that a safety harness was not necessary under these conditions because every time Cabahug moved along the ladder, the harness would have had to be removed and reattached. Not only was Cabahug moving along the ladder, the ladder itself was being lowered as Cabahug descended the ladder to clear the warping wire. However, Cairns testified that the presence of the safety line would have prevented the accident.
In this case, Cabahug had a duty to act as a reasonable seaman under the circumstances to protect himself. The corresponding duty of the defendants was also one of ordinary care. Scurlock, 107 F.3d at 339. Our review of the record indicates as Cabahug descended the ladder, he held on to the handrails of the ladder with both hands and used his foot to keep the warping wire away from the ladder. Because the implementation of a safety line would have necessitated the line be untied and reattached every time Cabahug moved, we find that such a method was not reasonable under the circumstances, and that Cabahug's failure to use a safety line was not contributory negligence on his part.
Given the fact that Nabelsy and Captain Lyras were both aware of the possibility that the warping wires would strike the accommodation ladder during loading operations, we find the defendants did not exercise ordinary care by having Cabahug descend the ladder under these conditions rather than just have the stevedores move the warping wire. Under the facts of this case, and applying the Gautreaux standard of care to Cabahug's actions we find there was Jones Act negligence on the part of the defendants.

Unseaworthiness
Cabahug contends that the placement of the warping wires to the vessel's accommodation ladder and the failure to issue him the proper safety equipment form the basis for claims of Jones Act negligence and unseaworthiness. Although negligence and unseaworthiness are totally separate concepts, the same factual basis has been used to assert both theories of recovery. See Brunner v. Maritime Overseas Corporation, 779 F.2d 296, 298 (5th Cir.1986), cert. denied, 476 U.S. 1115, 106 S.Ct. 1971, 90 L.Ed.2d 655 (1986).
The owner of a vessel has a duty to furnish a seaworthy vessel. This duty is absolute and nondelegable. It extends to a defective condition of the ship, its equipment, or appurtenances. A ship's equipment and appurtenances include most objects and things onboard or attached to the vessel regardless of whether the item belongs to the ship or is brought aboard by a third party. A breach of a *1252 duty of seaworthiness gives rise to a claim for general damages. The plaintiff bears the burden of proving that "the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." Foster, 700 So.2d at 209 (citations omitted.)
The test for determining unseaworthiness is one of reasonable fitness. The vessel, its equipment, and appurtenances need not be perfect, but all must be reasonably fit for their intended use. Unseaworthiness is a relative term dependent on the circumstances. Generally, a plaintiffs own fault will proportionately reduce his recovery for injuries caused by unseaworthiness. However, if a seaman's own negligence was the sole cause of his injuries, recovery will be barred. Foster, 700 So.2d at 209 (citations omitted.)
The trial court found that the M/V NIKI was unseaworthy at the time of Cabahug's accident, and that the vessel's unseaworthiness was the proximate cause or a substantial cause in fact of Cabahug's accident. The trial court found the specific source of unseaworthiness was that the vessel's officers instructed Cabahug to engage in an unsafe method of work, and that the vessel's crew was inattentive and failed to keep a proper lookout over Cabahug during his work. The trial court further found that the method of mooring the warping wire from the crane barge to the vessel created a dangerous or hazardous condition and work environment, and that the defendants had actual knowledge of this condition but failed to properly instruct the vessel's crew and Cabahug regarding safe working practices and the need for Cabahug to wear a safety line and harness while working on the ladder.
Based on our review of the record, we cannot say the trial court's finding the vessel unseaworthy was clearly wrong. See Jordan v. Intercontinental Bulktank Corporation, 621 So.2d 1141, 1155 (La. App. 1st Cir.), writs denied, 623 So.2d 1335, 1336 (La.1993), cert. denied, 510 U.S. 1094, 114 S.Ct. 926, 127 L.Ed.2d 219 (1994). The location of the warping wire and the accommodation ladder created a possibility that the ladder would be damaged if the ladder snagged on the wire. The chief mate, Nabelsy, knew that the location of the warping wire created a condition where the ladder could be struck by the wire and cause the ladder to jerk. We agree with the trial court that such conditions made the vessel unseaworthy. Under these circumstances, the ladder was not safe for anyone.

Negligence Per Se
The trial court's reasons for judgment state, "[d]efendants violated a `statute enacted for the safety of employees', and that the violation contributed to Plaintiffs injuries; therefore as a matter of law, any contributory negligence by Plaintiff cannot be considered by this Court." Yet, the trial court never indicated precisely what "statute enacted for the safety of employees" was violated by the defendants. We infer from the trial court's reasons for judgment that certain nonspecified Coast Guard statutes were violated. However, the United States Supreme Court held in Seaboard Air Line Railway v. Horton, 233 U.S. 492, 503, 34 S.Ct. 635, 639, 58 L.Ed. 1062, (1914), that the phrase "any statute enacted for the safety of employees" was intended to include only federal statutes. Because the trial court did not specify a federal statute that the defendants violated, we cannot agree with the finding of negligence per se. Accordingly the trial court erred in finding the defendants negligent per se.

DAMAGES

General Damages
In reviewing damage awards the appellate court must take into account the particular effect of the particular injuries on the particular plaintiff. The initial inquiry is whether the award for the particular *1253 injuries and their effects under the particular circumstances on the particular inured person is a clear abuse of the "much discretion" of the trier of fact. Only after such determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point, which is reasonably within that discretion. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379.
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, we are mindful that the discretion vested in the trier of fact is "great," even vast, so that an appellate court should rarely disturb an award of general damages. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn, 623 So.2d at 1261.
In the present case, Dr. Marshall Harrison, Jr., who treated Cabahug in the emergency room at OLOL in Baton Rouge and was accepted by the trial court as an expert in oral facial surgery, testified that Cabahug's injuries included five open mandibular fractures with gaping lacerations around his chin that went through the bone and into his mouth; six upper jaw fractures in multiple segments; a right cheekbone fracture; a blowout of the orbital floor fracture; and multiple fractures of the teeth and supporting bone. According to Dr. Harrison, Cabahug's injuries were consistent with someone who had fallen approximately twenty-five to thirty feet and whose face had absorbed the brunt of the fall.
In addition to the extensive facial injuries, Cabahug also needed an emergency tracheotomy, and sustained a fractured cervical vertebra, in addition to pulmonary contusions, a fractured sternum, and fractured ribs. When Cabahug was first brought to OLOL, his injuries were life threatening. The first surgery performed on the date of Cabahug's accident was only a temporary stabilization procedure to remove foreign bodies, tooth fragments, and irrigation of the injuries. Dr. Harrison testified he was unable to do more due to the life-threatening condition from the rest of Cabahug's injuries.
Ten days after the accident, Cabahug was stabilized and he underwent a seven to eight-hour operation to wire the bone plates and fractures back together. Dr. Harrison testified that this procedure essentially reconstructed Cabahug's jaws and face. According to Dr. Harrison, piecing together Cabahug's jaws and teeth was like "putting together a jigsaw puzzle." Cabahug was discharged from the hospital on January 4, 1996. However, his jaw remained wired shut for three to four months.
Cabahug underwent minor surgery on June 25, 1996, to extract some remaining roots within his jawbone and to smooth his mandible and maxilla. This was necessary to prepare Cabahug to wear a dental prosthesis. Because of his injuries, Cabahug has extreme disorganization of his face, which was noted by the trial court.
Dr. Michael Maginnis was accepted by the trial court as an expert prosthodontist, which is a dental specialty that deals with replacing missing teeth and rebuilding worn teeth. Dr. Maginnis began treatment of Cabahug in July 1996. According to Dr. Maginnis, Cabahug can only open his mouth a range of 30 millimeters, which is about 75% of the normal range. Dr. Maginnis testified that Cabahug would never regain full range of motion of his mouth. Dr. Maginnis described the extensive dental work he performed on Cabahug *1254 that included placing crowns or bridges, which affected essentially every tooth in his mouth. Dr. Maginnis testified that these extensive dental restorations would have to be replaced every ten years. Considering Cabahug's life expectancy, Dr. Maginnis estimated the replacements would have to be performed four more times.
Cary Rostow, who was accepted by the court as an expert in neuropsychology, testified that his evaluation indicated that Cabahug had symptoms of unhappiness, lacked energy, and experienced problems with his appetite and sleeping. In Dr. Rostow's opinion, Cabahug was experiencing signs of moderate depression, which he related to the effects of the accident.
Cabahug testified he can no longer play basketball. Playing basketball was something in which Cabahug participated in conjunction with youth programs in the Philippines before he found work as a seaman. He testified that prior to his accident, he weighed 135 pounds; however at one point after the accident, Cabahug's weight dropped as low as 95 pounds. He described residual problems with pain in his neck, sternum, back, and facial pain. Cabahug indicated that he still experienced pain when he attempted to open his mouth widely.
Cabahug testified that reading bothered his eyes; he had problems sleeping; and had recurring nightmares that he was drowning. Cabahug had earned a degree in marine transportation from the Iliolo Maritime Academy in 1983. However, Cabahug testified that he feared he could no longer work as a seaman due to the dizziness and apprehension he now experienced.
When these factors and the other factors pointed out by the trial court are considered under the standards discussed above, we cannot say that the trial court abused its discretion in fixing the generous awards of general damages. We do not find the total general damages award of $700,000.00 to be an abuse of the "much discretion" of the trial court. Cabahug sustained excruciating injuries to his face as a result of his fall and has undergone a painful and partial recovery. He will never regain full motion of his jaw. He is permanently disfigured and will require periodic complete dental replacements for the remainder of his life. Accordingly, the award of general damages, which includes Cabahug's past and future pain and suffering, past and future enjoyment of life, and his permanent scarring and disfigurement, is affirmed.

Future Lost Wages
The trial court found Cabahug had sustained a significant loss of earning capacity as a result of his injuries and permanent disabilities. The trial court awarded $337,079.00 as the present value of Cabahug's loss of earning capacity as calculated by Dr. Randy Rice, plaintiff's expert economist.
Defendants assert the trial court erred in relying on the testimony of Sharon Roe, an economist who used United States data regarding the economic analysis for Cabahug, who is a Filipino. We find the trial court's reliance on Roe's testimony went to her credibility as a witness. The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Miley v. Louisiana Farm Bureau Casualty Insurance Company, 599 So.2d 791, 809 (La.App. 1st Cir.), writ denied, 604 So.2d 1313 (La.1992).
Roe testified that Cabahug would be unable to return to his former occupation as a merchant seaman, and was unemployable in his home country of the Philippines because of the high unemployment rate and the prejudice against people with disabilities. Although we may have reached a different determination regarding Roe's credibility as a witness if we were sitting as the trier of fact, we cannot say there is any evidence that the reasons for Roe's *1255 opinion were patently unsound. Roe did travel to the Philippines and research the Philippine job climate regarding someone with Cabahug's injuries. Accordingly, we find no error in the award for future lost wages.

Award of Past Care and Maintenance
Defendants argue that the trial court's award of $25,351.47 as past care and maintenance expenses was erroneous. The defendants contend that they have satisfied all maintenance and cure obligations.
There is an ancient duty of a vessel to provide maintenance and cure to a seaman who is injured or falls ill while in the service of the ship. Maintenance is comparable to the value of food and lodging provided by the vessel. Springborn v. American Commercial Barge Lines, Inc., 767 F.2d 89, 94 (5th Cir.1985). Cure is the payment of reasonable medical expenses incurred by the seaman for curative treatment or until maximum benefit of treatment is reached. See Jordan, 621 So.2d at 1153.
In a stipulation filed into the record on August 25, 1997, the parties agreed that the defendants had paid $1,220.00 in sick wages pursuant to Cabahug's employment contract and $8,190.00 in maintenance payments, which covered the period from January 5, 1996, until July 3, 1997, at a rate of $15 a day. The stipulation also indicated that the defendants had paid $125,122.25 in medical expenses, and agreed to pay $8,755.80 in additional medical expenses. Defendants argue this stipulation satisfies the maintenance and cure obligation owed to Cabahug.
However, Cabahug presented testimony from Judy Erhardt, who provided room and board to Cabahug from January 8, 1996, until late April 1997. Erhardt testified she was a registered respiratory therapist, who worked out an agreement with Cabahug's attorney to provide room and board at a rate of $350.00 a week. Erhardt testified for the first four months Cabahug spent with her family, she spent four to five hours a day attending to his needs, such as helping him dress, preparing special meals that he could consume given the condition of his jaws, and transporting him to his doctor's appointments. After the first four months, Cabahug became a little stronger, and Erhardt testified she only had to spend three to four hours a day attending to his needs.
The trial court characterized these expenses incurred at the Erhardt's house as maintenance and cure. The trial court found that Cabahug actually incurred $33,541.47 from January 1996 through June 3, 1997. The trial court credited the $8,190.00 paid pursuant to stipulation and awarded the remaining $25,351.47 as past maintenance and cure. Considering the facts in the record regarding Cabahug's condition, we find no error in the award of past care and maintenance.

Loss of Future Found
"Found" is an element of damages representing the value of living expenses provided to a seaman by his employer as a condition of employment while aboard ship. Found generally includes expenses for food, lodging, and clothing. Youn, 623 So.2d at 1261. The trial court awarded $71,792.00 as loss of future found. The trial court obtained this figure by splitting the difference between the valuations of found of $18.00 per day (total loss of future found equals $108,511.00) and $6.50 per day (total amount of loss of future found equals $35,073.00). Such a determination was error.
The basis for the $18.00 a day valuation was taken from the testimony of Dr. Craige Forsyth, a marine sociologist, who testified on behalf of Cabahug. Dr. Forsyth indicated that the $18.00 per day figure was used in International Trade Federation contracts. However, such contracts did not apply to the M/V NIKI. Further, Dr. Forsyth has never been aboard the M/V NIKI nor interviewed anyone associated with the vessel to determine the value of found. Dr. Forsyth arrived at the figure of $18.00 a day as the value of found on board the M/V NIKI, yet he failed to offer any proof of what kind of *1256 food or lodging was provided to the M/V NIKI's crew. Considering there was no factual basis for Dr. Forsyth's $18.00 per day figure as the value of found on the M/V NIKI, we find the trial court erred in considering Dr. Forsyth's valuation of found.
However, the deposition testimony of Captain George Lyras, who managed the M/V NIKI on all matters except obtaining crewman, indicated that it cost the vessel $6.50 a day to provide food, lodging, and laundry services for each crewmember. Captain Lyras' testimony is based on personal knowledge considering his position of managing the M/V NIKI. For the trial court not to accept Captain Lyras' testimony was error. Therefore, we reduce the award of loss of future found to $35,073.00.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed. However, the judgment is reduced by the amount of the award of loss of future found, from $71, 792.00 to $35,073.00. Accordingly, the amount of the judgment in favor of Tomas Reyes Cabahug is reduced to $1,194,442.47 All costs of the appeal are to be assessed to the defendants, Text Shipping Company and United Kingdom Mutual Steam Ship Assurance Association (Bermuda) Ltd.
AMENDED; AFFIRMED, AS AMENDED.
NOTES
[1] Hon. William F. Kline, Jr., retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Although counsel for defendants read the contents of the stipulation in the transcript, the actual stipulation was not included in the record and exhibits sent from the district court.
[3] Defendants also assert the trial court erred as a matter of law by applying an improper legal standard in evaluating Cabahug's claims of unseaworthiness. Our reading of the reasons for judgment indicate that the trial court only applied the improper standard of care for a seaman to Cabahug's claims of Jones Act negligence.
[4] At the time of trial, Mustafa Nabelsy had achieved the rank of captain.