UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 91-4432
_____

ZAPATA HAYNIE CORPORATION,

Plaintiff-Appellee,

versus

FRANCIS ARTHUR, ET AL.,

Defendants,

MARY KING-HILL, Etc., MARGARET HEBERT
JACKSON, Etc., and NATURAL GAS PIPELINE
COMPANY OF AMERICA, LILLIE MAE WILLIS,
MRS. GUSSIE MAE JACKSON, Etc., LINDA
BENJAMIN, Etc., FRANCIS McNEAL GOUGH,
BILLIE McDOUGLE, Etc.,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Western District of Louisiana
_____
(December 15, 1992)

Before JOLLY and HIGGINBOTHAM, Circuit Judges, and WILLIAMS,
District Judge:[*]

E. GRADY JOLLY, Circuit Judge:

In this appeal, we review the district court's judgment
exonerating Zapata Haynie Corporation from liability for injuries
and damages resulting from the collision of its vessel, the F/V
NORTHUMBERLAND, with a natural gas pipeline owned by Natural Gas

_____

[*]District Judge of the Northern District of California,
sitting by designation.

Pipeline Company of America ("NGP").  We find no reversible error, and therefore AFFIRM the judgment of the district court.

I

Shortly before 6:00 p.m. on October 3, 1989, the F/V NORTHUMBERLAND, a menhaden fishing vessel owned and operated by Zapata, struck a submerged sixteen-inch-diameter natural gas pipeline owned by NGP.  Although the pipeline was required to be buried three feet below the surface of the Gulf of Mexico, it had become partially exposed.  Within seconds after striking the pipeline, the vessel was engulfed in flames.  Of the fourteen persons on board at the time of the accident, eleven died (two in the explosion and fire, and nine by drowning).

Zapata filed a complaint for exoneration from and/or limitation of liability pursuant to the Limitation of Shipowners' Liability Act, 46 U.S.C. §§ 181, et seq. NGP, the crewmembers, and the survivors of the deceased crewmembers ("the Jones Act claimants") filed claims and contested Zapata's right to limitation or exoneration.  Following a three-week trial, the district court found that the accident was caused solely by the negligence of NGP, and that Zapata was not at fault for either the accident or any of the resulting injuries or deaths.  NGP has not appealed the finding that it was negligent.

NGP and the Jones Act claimants contend on appeal that the district court clearly erred in finding that Zapata was not negligent in causing the accident or the resulting injuries and deaths. NGP further contends that, because the district court made no reference to the legal standard it applied in determining whether Zapata was negligent in striking the pipeline, it must have applied the wrong standard. We disagree. When addressing the Jones Act claimants' arguments that Zapata had a duty to require the crewmembers to wear flotation devices at all times and/or to teach them to swim, the district court stated that Zapata "did not breach any duty which would subject it to liability under either routine negligence or Jones Act standards." Based on our review of the record and the district court's opinion, we are convinced that the district court applied the appropriate legal standards in determining all of the issues before it.

Under the Jones Act, Zapata "must bear the responsibility for any negligence, however slight, that played a part in producing the plaintiff[s'] injury." In re Cooper/T. Smith, 929 F.2d 1073, 1076-77 (5th Cir.), cert. denied sub nom. Abshire v. Gnots-Reserve, Inc., ___ U.S. ___, 112 S. Ct. 190 (1991). The burden of proving causation under the Jones Act is "very light" or "featherweight." Id. at 1076. "Questions of negligence in admiralty cases are treated as factual issues, and are thus subject to the clearly

erroneous standard."  Noritake Co., Inc. v. M/V Hellenic Champion, 627 F.2d 724, 728 (5th Cir. 1980).  A factual finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573 (1985) (citation omitted).  "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.  Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  Id. at 573-74.

B

NGP contends that Zapata was negligent in failing to heed published warnings regarding the dangers of navigating near pipelines; failing to ensure that the master of the F/V NORTHUMBERLAND, Captain Gough, knew how to read a nautical chart, and used it for navigation; failing to equip the vessel with a fathometer; and failing to use caution in shallow water pipeline areas or to leave a margin of safety below its keels.  It further contends that Zapata's assumption that all pipelines are always buried was negligent in the light of its knowledge of two prior collisions with exposed pipelines, Captain Gough's personal experience in pulling up a pipeline with his anchor, and the lack

-4-

of any authoritative navigational aid advising mariners of the depth at which pipelines are buried.

(1)

NGP contends that Zapata negligently ignored Coast Guard publications warning of the higher level of care required of mariners navigating near pipelines. The district court found that there was no evidence that Captain Gough's failure to consult these publications caused or contributed to the accident. This finding is supported by the evidence and is not clearly erroneous.

(2)

NGP next contends that Zapata negligently failed to use nautical charts. The nautical chart of the area depicted the NGP pipeline, but did not indicate whether it was buried. The chart warns mariners to use caution "when anchoring, dragging or trawling" in pipeline areas. Captain Gough did not consult this chart before the collision, and there was evidence indicating that he did not know how to read and interpret the chart. However, the district court found that Captain Gough's failure to consult the chart was not a cause of the accident:

> Even had Captain Gough noted the location of the pipeline on the chart, or plotted it from the chart or Loran, he had no reason to believe that he could not safely navigate over it; he had fished the waters in the area for thirteen years five days a week, six months a year, and made thousands of sets without any problems. Nor would avoidance of the charted location have prevented this accident because the charted location of the pipeline was approximately [150] feet west of the actual location of the pipeline.

The record contains ample evidence to support these findings.

(3)

NGP maintains that Zapata was negligent in failing to equip the F/V NORTHUMBERLAND with a fathometer, leaving Captain Gough with no way to determine the depth of the water other than by nudging the bottom and backing off. The record contains considerable evidence that Zapata's vessels frequently touch bottom while engaged in menhaden fishing operations. However, Captain Gough and the two other survivors all testified that the vessel was not touching bottom at the time of the collision. The district court found that all of Zapata's navigational equipment was in working order and met or exceeded Coast Guard requirements. It further found that there was no showing that a fathometer would have enabled the vessel to avoid this accident. Those findings are not clearly erroneous.

(4)

NGP introduced evidence that Zapata and Captain Gough routinely operated their ships at or below the mudline in shallow water. Because the menhaden fish often school close to the shore in six to twelve feet of water, and Zapata had a policy of "no fish, no pay," NGP asserts that economic pressures led the crews to pursue the fish into this shallow water despite the fact that the draft of the ships often exceeded the water depth. Nevertheless, the district court found that the F/V NORTHUMBERLAND was not

-6-

operating below the mudline when the accident occurred. As we have previously stated, that finding is not clearly erroneous.

(5)

NGP cites the following as evidence that Zapata's reliance on the assumption that all pipelines are always buried was unreasonable: (1) in 1981, the Zapata ship MISSISSIPPI SOUND, operating in shallow waters, struck a gas pipeline that had become exposed; (2) Zapata was aware that in 1987, the menhaden ship SEA CHIEF struck a pipeline that had become exposed, and the Coast Guard's investigation found a contributing cause to have been the ship's operation at or near the sea bottom; (3) earlier in 1989 prior to the collision, Captain Gough picked up another pipeline with the NORTHUMBERLAND's anchor in the Sabine Pass area and set it back down, without reporting the incident to the government or any pipeline company; and (4) Zapata's spotter pilot, who directed the NORTHUMBERLAND to a school of menhaden prior to the collision, knew that NGP's pipeline traversed that area, and knew that coastal erosion had occurred in the area. NGP contends that because Zapata and Captain Gough knew of these incidents, they had no legitimate basis for assuming that the pipelines were buried, especially since they did not even know the depth of such assumed burial.

The district court found that the incidents cited by NGP were not of a nature to put Zapata on notice that it should expect other pipelines to be unburied. Based on the evidence in this record, we cannot say that the district court's finding is clearly erroneous.

Although we consider Zapata's assumption that all pipelines are always buried to be somewhat troubling in the light of its knowledge of these other incidents, we are mindful of Captain Gough's testimony that he had fished the waters in the area for thirteen years without any problems, and of the evidence that numerous other fishing vessels operated in the same area over the years without mishap.

C

NGP relies on our court's recent decision in <u>Pennzoil Producing Co. v. Offshore Express, Inc.</u>, 943 F.2d 1465 (5th Cir. 1991) in support of its argument that Zapata must bear some responsibility for the accident. In that case, Offshore's vessel struck a natural gas pipeline 25 feet outside of the dredged channel on a dark and foggy night. The district court found that the Offshore vessel's captain was negligent in proceeding up a canal in the fog, at a speed greater than was prudent under the circumstances, without using his spotlight or fathometer, and without posting a look-out in the bow. Offshore argued that the right to navigation was paramount, and that by allowing its pipeline to become an obstruction to navigation, United Gas should bear sole responsibility for the accident. Our court rejected that argument, and affirmed the district court's assessment of Offshore's fault at fifty percent, stating:

> It is certainly true that the right to navigate is paramount, and that those who place objects in, under, or over a waterway must do so in a way that

> does not interfere with navigation, including navigation outside a dredged channel. Offshore Express is incorrect, however, to assert that this right of navigation is wholly unfettered: when a mariner knows of obstructions to navigation, he must avoid them.

943 F.2d at 1470.

NGP contends that the district court's findings in this case and our court's holding in Pennzoil cannot both be correct, because the cases are indistinguishable. NGP's argument fails to apprehend our function as an appellate court. We do not sit as the trier of fact, and we cannot reverse a district court's findings simply because we might have viewed the evidence differently. The district court in Pennzoil found that the master of the Offshore Express vessel knew of the existence and location of the pipeline and was negligent in failing to use a fathometer and in running at an imprudently high speed on a dark and foggy night. On appeal, our court held that those findings were not clearly erroneous. In this case, the district court found that Captain Gough was navigating the vessel in a prudent manner at the time of the accident, and that he had no reason to know that the NGP pipeline was not buried. Those findings are supported by the evidence and are not clearly erroneous. The difference in the results of this case and the Pennzoil case reflects nothing more than a proper application of the clearly erroneous standard of review.

D

The Jones Act claimants, relying on case law holding that maritime employers have a duty to instruct employees as to the proper use of life-saving devices, contend that Zapata was negligent in failing to either require its crewmembers to wear flotation devices at all times, or teach them to swim. They point out that Zapata knew that most of the crewmembers could not swim, and further note that the only non-swimmer who survived happened to be wearing a ski belt at the time of the accident. The other two survivors were both swimmers. The nine crewmembers who drowned were not wearing any flotation devices at the time of the collision.

The district court found that the NORTHUMBERLAND met or exceeded all Coast Guard requirements for safety training and equipment. Safety drills were conducted to teach emergency procedures, and crewmembers were instructed as to the use of safety equipment on board. Each crewmember had a personal flotation device, and additional flotation devices were located on deck and in the pilot house. Although Zapata required crewmembers to wear flotation devices while aboard the purse boats and while crossing back and forth between the purse boats and the steamer, it did not require them to wear flotation devices while on the steamer.

Although the district court found that the nine crewmembers who drowned might have had an increased chance for survival if they had been wearing flotation devices at the time of the collision, it

concluded that Zapata had no legal duty to require the crewmembers to wear flotation devices on board the steamer at the time of the accident. The district court pointed out that the vessel was in calm seas, under clear skies in daylight, and was not engaged in any dangerous maneuver at the time of the accident. It found that the crewmembers were unable to make use of the life jackets and other safety equipment on board because the vessel was engulfed in flames in three to five seconds, and there was not enough time for anyone to grab flotation devices before abandoning ship.

The district court's finding that Zapata took all reasonable precautions to safeguard the crew is not clearly erroneous. We decline to impose a general duty on vessel owners to teach crewmembers to swim or to require crewmembers to wear flotation devices at all times.

E

Because we hold that the district court did not clearly err in finding that Zapata was not at fault for the collision and resulting injuries, it is unnecessary to address the Jones Act claimants' contention that exoneration can be granted as to some claimants and denied as to others.

III

Our review of the record in its entirety convinces us that the district court's factual findings are not clearly erroneous. Accordingly, the judgment of the district court is

A F F I R M E D.

-11-