814 So.2d 783 (2002)
Lazaro HERNANDEZ
v.
BUNGE CORPORATION, McKinney Towing, Inc., Zen-Noh Grain Corporation, Welcome Fleet & Barge Service, Inc., ABC Insurance Company, DEF Insurance Company, GHI Insurance Company and XYZ Insurance Company.
No. 01-CA-1201.
Court of Appeal of Louisiana, Fifth Circuit.
April 10, 2002.
Rehearing Denied May 6, 2002.
*785 Lawrence Blake Jones, David C. Whitmore, Scheuermann and Jones, New Orleans, LA, and Joel T. Chiasson, Chiasson and Chiasson, Destrehan, LA, for Plaintiff/Appellant (Lazaro Hernandez).
Wilton E. Bland, III, C. William Emory, Mouledoux, Bland, Legrand & Brackett, New Orleans, LA, for Defendants/Appellees (McKinney Towing, Inc., McKinney Fleet & Barge Service, Inc. and Welcome Fleet & Barge Service, Inc.).
Panel composed of Judges SOL GOTHARD, THOMAS F. DALEY, and WALTER J. ROTHSCHILD.
SOL GOTHARD, Judge.
In this appeal, plaintiff, Lazaro Hernandez, seeks review of a trial court judgment dismissing his claims against defendant, McKinney Towing, Inc. (McKinney). For reasons that follow, we affirm.
This matter began when Hernandez filed a petition for damages he sustained while working as a deckhand. In his original petition, plaintiff asserted Jones Act and unseaworthiness claims against Bunge Corporation (Bunge) and McKinney. He also asserted claims in general maritime law against Zen-Noh Elevator (Zen-Noh) and Welcome Fleet & Barge Service, Inc. (Welcome), and a claim for maintenance and cure against his employer, McKinney. In a supplemental and amending petition, plaintiff added McKinney Barge and Fleet Service, Inc. (McKinney Barge) as a defendant. Bunge and Zen-Noh were dismissed from the suit, leaving only McKinney, McKinney Barge, and Welcome as defendants.[1]
In due course the matter went to trial on the merits, after which the trial court rendered a judgment against plaintiff, Lazaro Hernandez, dismissing all claims against McKinney.[2] Plaintiff appeals that judgment.

FACTS
The record shows that plaintiff was working as a deckhand in the employ of McKinney on August 18, 1995. While moving barges from the river tug, Anita Domino, into the tow of the Susan K, he injured his back and left shoulder. The trial court, in reasons for judgment, made the following factual findings:

*786 The Anita Domino's work consisted primarily of moving barges from the Zen-Noh grain elevator to the wash dock at Welcome Fleet at mile 163 on the Mississippi River and then into the tow of waiting line boats. The line boats (like the Susan K) would then push the barges upriver. On August 18, 1995, the Susan K arrived at Welcome to pick up five empty barges and two loads for just such an operation. Records show that the seven barges the Susan K was to pick up arrived at Welcome Fleet some time prior to August 16, 1995. On August 16th, the five empty barges were washed, and on August 18, 1995, at approximately 4:50 p.m., the Anita Domino began bringing the barges from the wash dock site of the river to the anchored Susan K. At approximately 5:30 p.m. that same day, there was a crew change, and plaintiff Lazaro Hernandez went on duty. He and Captain Glenn Williams were to complete the operation of moving the barges into tow.
Plaintiff's job during this period of time consisted of riding on the barges across the river from Welcome Fleet and then assisting the crew of the Susan K in wiring the barges into the tow. To do so, the crew and Hernandez used rigging consisting of heavy cable and ratchets. They would throw the rigging across the barges at the coupling sites and then make the wires fast.
Between 9:30 and 10:30 p.m. on August 18, 1995, plaintiff and the crew of the Susan K were distributing rigging on the port string of the tow. The evidence indicates that these barges were empty and had, therefore, been washed at the wash dock, which was also operated by a McKinney company. It was dark, and plaintiff was working with a flashlight that was attached to his vest. The Bunge employees were using bulls' eye lights that attached to their heads with a band. Plaintiff and the Bunge crew had been walking on the deck of the barge where the accident allegedly happened for approximately one hour prior to the time plaintiff claims he slipped and fell on grain.
At approximately 10:30 p.m. plaintiff fell while throwing a ratchet from the barge where he had been working to another barge that had previously been wired into the tow. The central issues of fact in this case is whether plaintiff slipped on a slick substance on the deck of the barge or whether he re-injured his back by throwing a ratchet, an action commonly done in the context in which plaintiff was working but one that his doctor had warned him not to perform.
At trial plaintiff testified he was working as a deckhand for McKinney on August 18, 1995. He and other deckhands were spreading rigging throughout each coupling in order to tie the empty barges together for towing by the Susan K. The Susan K is a large river boat that takes large numbers of barges up and down the river. The rigging consisted of large ratchets, sling wires and cables. In the process of setting this rigging, plaintiff had thrown about 8 or 9 ratchets, each of which consists of a barrel and two pelican hooks, and weighs about 30 to 40 pounds. As he went to throw one of the ratchets, he slipped and the ratchet hit him in the shoulder, knocking him toward the other barge. Plaintiff stated that "some kind of mushy smelly substance" on the deck caused him to slip. He called out for assistance and then got back on the Anita Domino and was taken to shore. He radioed the captain about the incident and the pain he was in. He was met at the dock by Warren McKinney, who took plaintiff to a Baton Rouge hospital where he was treated and released. Although his shoulder was his main concern initially, plaintiff *787 subsequently developed numbness in the leg and low back pain on his left side which continued to worsen. He called the company and was sent to a clinic to see Dr. Schiavi. Subsequently, plaintiff returned to Dr. Kenneth Adatto, who had previously performed surgery on his wrist and treated him for ruptured discs in his back. For the new injury Dr. Adatto recommended conservative treatment, as he had with the first injury. However, about three years after the second injury plaintiff required back surgery.
Plaintiff acknowledged that he injured his back in December of 1992, while in the employ of DRD Towing, and was pursuing a claim for social security disability benefits when he applied for the job with McKinney. He further stated that he understood the requirements of the job of deckhand as outlined in the McKinney job description. He admitted that he answered "no" to the question on the original application form from his first employment with McKinney in 1988 that asked "(d)o you now or have you ever suffered from back injuries, strains, fractures or disc injuries?" He knew the same question would be asked in 1995 when he re-applied for the same job.
Plaintiff stated that in 1989 when he left McKinney, he considered himself to be an experienced deckhand. He left the job because he was tired of the life style. Subsequently, he took a position with C & D Towing in which he worked daily shifts at the grain elevator, and did not have to stay on the boat for fourteen days straight. At the same time; he was also employed with Progressive Barge Line (Progressive) as a deckhand. He indicated the two companies were connected through family ownership, but the actual relationship is not certain from the testimony.
Plaintiff stated that he pulled a muscle in his right shoulder in 1990 while lifting wires on a rigging. In 1990 he left C & D Towing and Progressive, and went to work for DRD Towing. On December 28, 1992, he slipped and fell on his back while working on a ramp, injuring his wrist, back and neck. As a result of the injury, he was treated by Dr. Adatto from January, 1993 to August, 1994. Dr. Adatto performed surgery to repair a broken bone in plaintiff's wrist as a result of the fall. Dr. Adatto also treated him for his lower back injury, which consisted of two ruptured discs at L4-5.
Part of Dr. Adatto's records were read into the record. He stated that:
... the assessment is that he had a lumbar hernia, HNP, herniated nucleus pulposus ....we discussed the risk of surgery versus non-surgery and he was given the opportunity to ask questions. I advised him that the disability would be the same with or without surgery. Surgery is only indicated when you get to the point you can't live with the pain. There is a chance of paralysis with or without surgery. Living with the disc in will not kill or cause cancer, only pain. Eighty percent of the people learn to live with the pain. Twenty percent end up needing surgery. Of that twenty percent, eighty percent do well, twenty percent still have some trouble and ten percent have to go back a second time. We further discussed the risk of surgery including death, paralysis, scaring, loss of bowel and bladder function, etc....
When questioned about that conversation with Dr. Adatto, plaintiff said he did not recall discussing back surgery. However, in his deposition he recalled the conversation and said he decided not to have the surgery because he became frightened by the risks involved.
A second part of Dr. Adatto's record was also read into the record, which detailed *788 plaintiff's medical restrictions as follows:
He understands that he has a total permanent spinal disability whether he has surgery or not. He needs to avoid competitive stooping, bending or lifting objects over fifty pounds as well as prolonged standing or sitting in the same position without being able to move around and change positions.
Plaintiff stated that he did not recall that warning. Again plaintiff was impeached on this answer by his prior deposition, and he admitted he recalled Dr. Adatto discussing lighter work. In further questioning, plaintiff admitted he had continuing back problems at that time.
On July 7, 1994, Dr. Adatto wrote the following:
He also has a total permanent spinal disability. Anatomically, he has a ten to fifteen percent disability of the lumbar spine, functionally he needs to avoid repetitive stooping or bending and repetitive lifting objects over twenty-five to fifty pounds. The patient also needs to avoid prolong sitting or standing in the same position for forty-five minutes plus or minus fifteen minutes without being able to move around and change positions. The disability and restrictions are the same with or without surgery.
After hearing that portion of Dr. Adatto's record read at trial, plaintiff admitted he did not have the surgery because he was scared, and he did recall Dr. Adatto advising him of the weight restrictions.
Plaintiff testified that he was out of work from the time he injured his back in 1992, until he was re-hired by McKinney in 1995. During that period he hired an attorney to secure social security disability benefits. In the application for those benefits signed by plaintiff on October 20, 1994, plaintiff maintained he was eligible for the benefits because of his fractured wrist and the "bad discs" in his back. He also wrote that he could not bend, lift, or squat for a long period of time.
Dr. James Williams evaluated the plaintiff for the social security benefits claim in January, 1995. At that time plaintiff reported to Dr. Williams that he had back pain associated with any kind of activity, especially bending or lifting. Plaintiff also complained of pain in the right buttocks.
Simultaneous with the disability process, plaintiff pursued a claim against DRD Towing for the injuries sustained in the 1992 fall. He received maintenance and cure, and the claim was ultimately settled for $112,500.00 on January 31, 1995.
Plaintiff admitted he lied on his application to McKinney, but claimed he did so because he was feeling better and he could do the job. He also admitted he needed the money and he knew that McKinney would not hire him as a deckhand if they knew about the ruptured discs in his back.
Plaintiff testified that part of his job as a deckhand is to promptly remove any foreign substance spilled on the deck or hatch covers. However, plaintiff stated that he did not see the grain until he slipped in it. He was using a flashlight and visibility was "fair." He had untied barge three, the barge on which he later slipped, and rode the barge across the river to where the Susan K was docked. At that time, it was early in the evening and there was sufficient natural light. He walked across the barge with no traction problems and did not see any loose grain at that time. In positioning the barge in the line for tow, he had to maneuver around some floating debris. While he was getting the rigging together he could see the wires, the ratchets, and the other rigging equipment. He had a flashlight strapped to his vest that was pointed down. The weather was clear, and he saw no water on the deck. He *789 and other deckhands were working on the couplings for about an hour before the fall. He stated that the captain of Anita Domino could have moved the tug further down the barge to shine more light on it, but did not. He did not radio the captain and ask for more light. Plaintiff stated that he had a bullseye light, which is worn on the head and provides more light than a flashlight, but there were no batteries to power it; however, he also said he was more comfortable that night with just the flashlight.
Captain Glenn McKinney, President of McKinney, testified at trial that he hired plaintiff in February, 1995. Plaintiff had previously worked for the company, but Captain McKinney's father, who is now deceased, was president of the company at the time, and Captain McKinney did not know the details of the prior hiring, which occurred in the late 1980's. However, he did recall that plaintiff was a good worker and the captain was pleased to re-employ him. Captain McKinney explained that the job for which plaintiff was applying required physical fitness. The company requires all applicants for the position to pass a physical examination and a drug screening test. The company has set standards for the position of deckhands that are set forth in writing. In connection with Captain McKinney's testimony that document was introduced. It states the following job description:
Deckhands are responsible for maintaining the cleanliness of the vessel; handling tow and mooring lines; lifting heavy marine equipment; climbing ladders and stairs; repetitive bending and stooping; lifting weights ranging from less than 5 lbs. to occasional weights in excess of 70 lbs. Average weights are about 35 lbs. The equipment and other tools deckhands will lift may be stored as low as floor level. Deckhands typically work 14 days on the vessel and 7 days off the vessel. Deckhands may work as many as 28 consecutive days at sea without any means of reaching shore. The number of deckhands on the vessel is limited. A direct threat to the safety of the vessel and crew will occur if a deckhand cannot perform the essential functions of the job, with or without reasonable accommodations.
The document also explains that a deckhand will typically work 12 hour days, spent standing and walking. The objects they would be required to lift include pumps, sack material, tow and mooring lines, rigging for barges, steel cable, and anchors, with a maximum weight of 75 pounds. The job description further informs prospective employees that stooping and bending, crouching, squatting, and kneeling would be necessary on a daily basis.
At the time plaintiff applied, Captain McKinney had no reason to think plaintiff would not pass the tests and be able to perform the duties required of a deckhand, as he had in his previous employment with the company. The captain explained that normally on a re-hire he would check the prior work record of the applicant, but because he knew plaintiff personally and remembered him to be a good worker, he did not read his personnel file.
Captain McKinney testified he had no knowledge of plaintiff's back injury. He stated that had he known, he would not have offered plaintiff the job of deckhand. Instead, he would have placed plaintiff in a position of driver or watchman to insure that the job requirements did not exceed plaintiff's medical restrictions.
Captain McKinney was questioned about a letter contained in plaintiff's personnel file dated May 4, 1993. The letter is from an attorney representing plaintiff for a personal injury claim and asking for plaintiff's *790 "personnel record, including any pre-employment physical examinations conducted." The letter does not indicate the date or type of injury sustained.
Captain McKinney also testified regarding the washing of the barges. In 1995, at the time of the injury, Garry Warner was the supervisor in charge of washing barges at McKinney's facility. Captain McKinney explained that once a barge is unloaded, it is cleaned. McKinney uses various barge cleaning services for this purpose. Occasionally a barge is sent back for re-washing. All of the cleaning information is kept in a log.
Warren McKinney, Captain McKinney's son and the personnel director for McKinney, testified that plaintiff was referred to him by Captain McKinney. Warren McKinney was aware that plaintiff had worked for the company previously, but did not know him personally. Warren McKinney was the one who actually approved the re-hiring of plaintiff. Mr. McKinney testified he did not refer to plaintiff's prior personnel record, which would be stored in the archives, because Captain McKinney had sent plaintiff to him. Mr. McKinney testified that, during the six month period from the time plaintiff was re-hired until the injury, he had no complaints regarding plaintiff's work. Further, plaintiff never complained of, or took time off for, back or muscle pain.
Plaintiffs application for the re-hire shows that he listed McKinney Towing, Progressive Barge, C & D Towing, and Regal Automotive as former employers. He did not list DRD Towing. Mr. McKinney stated that the standard procedure is to get references from former employers, and he further testified that if plaintiff had listed DRD Towing, Mr. McKinney would have called the company. During the interview, plaintiff did not mention anything about his back injury. Mr. McKinney verified Captain McKinney's testimony that plaintiff would not have been hired for the position of deckhand if the back injury was disclosed.
The deposition of Garry Warner, a fleet foreman with McKinney, was introduced into evidence. In the deposition, Mr. Warner explained that the duties of a fleet foreman include maintaining the wash dock, repairs, and cleaning the fleet. The facilities used by McKinney for cleaning and repair of the barges in 1995 belonged to Welcome. Mr. Warner described the cleaning of a "hopper" barge, which is the type of barge on which plaintiff was injured. He explained that the empty barge is cleaned with a device that rotates at 1800 r.p.m.'s and puts out 80 pounds of pressure. There is also a pickup, or siphon hose, to remove the water. Thus, the machine both blasts water into, and pumps water out of the barge. First the covers are washed and then the interior of the hopper is washed. After that process is complete, crew members go inside the hopper and squeegee the hopper floor and mop the hopper and the barge surface to get up all of the excess water. After the process is complete, there is no residue of the cargo left on top of the barge. If a "special" cleaning is requested, the covers are removed and the combing caps are cleaned. On August 16, 1995, he repaired and cleaned five barges that were emptied at the Zen-Noh grain elevator. After they were cleaned and repaired, the barges were moored near the wash dock until they were brought over to be placed in tow.
The record also contains the deposition of Dr. Kenneth Adatto, plaintiff's personal physician, who treated him for both the 1992 injury and the 1995 injury. Dr. Adatto stated that he treated plaintiff for a broken wrist and a back injury in early 1993. Diagnostic studies and clinical findings *791 led to a diagnosis of a herniated disc at L4-5 and/or L5/S1. Dr. Adatto stated that the 1995 incident re-injured the back at the L4-5 disc, and this time the injury required surgery. Dr. Adatto performed an anterior lumbar fusion on the injured area in January, 1998, and within six months plaintiff was much improved.
Dr. Adatto testified that he placed restrictions on plaintiff from the time he first injured the L4-5 disc in 1992. Those restrictions are still recommended even after the surgery. The restrictions include avoiding repetitive stooping, bending, and lifting objects over 25 to 50 pounds, and avoiding prolonged sitting or standing. However, Dr. Adatto did tell plaintiff he could return to work, provided he found something light. Dr. Adatto stated that the injury suffered by plaintiff in 1995 was an aggravation of a preexisting condition caused by the earlier accident.
Dr. Adatto testified that plaintiff had a permanent disability of 10 to 20% after the first accident, which did not change after the second accident. The only thing that changed was that the second time the damage required surgery to repair. Dr. Adatto explained that the disability rating after the first accident derives from both the wrist injury, which would prevent plaintiff from doing overhead lifting, pushing, or pulling with the left wrist and hand, as well as the back injury. Dr. Adatto testified that, if plaintiff overloaded his spine by doing the heavy manual labor of a deckhand, he put himself at risk of reinjuring his preexisting disc problem.

LAW AND DISCUSSION
In brief to this court, plaintiff assigns six errors allegedly made by the trial court. The first three concern the finding by the trial court that plaintiff forfeited his right to maintenance and cure by withholding information in the application process.

MAINTENANCE AND CURE
In plaintiff's three assignments, which relate to this issue, he argues that the information withheld was not material, and was known to McKinney, and that there was no causal connection between the prior injury and the accident in question herein.
Maintenance and cure is an obligation imposed upon a shipowner to provide for a seaman who becomes ill or injured during his service to the ship. Silmon v. Can Do 11, Inc., 89 F.3d 240, 242 (5th Cir.1996). A seaman's right to maintenance and cure is implied in the employment contract between the shipowner and the seaman, and the owner of a vessel is almost automatically liable for the cost of medical treatment and basic living expenses when seamen in its employ are injured. It is not predicated on the fault or negligence of the shipowner. Aguilar v. Standard Oil of New Jersey, 318 U.S. 724, 730, 63 S.Ct. 930, 934, 87 L.Ed. 1107(1943); Brister v. A.W.I., 946 F.2d 350 (5th Cir.1991), rehearing denied, 949 F.2d 1160 (5th Cir.1991). Maintenance and cure may be awarded even when the seaman has suffered from a preexisting injury; nonetheless, a seaman may forfeit his right to maintenance and cure when he fails to disclose, or misrepresents material medical facts, when asked in an employment application. McCorpen v. Central Gulf Steamship Corp., 396 F.2d 547 (5th Cir.1968), cert. denied, 393 U.S. 894, 89 S.Ct. 223, 21 L.Ed.2d 175 (1968). The forfeiture of maintenance and cure is an affirmative defense and requires three criteria: (1) the seaman intentionally misrepresented or concealed information concerning a prior injury or condition; (2) which is material to the employer's decision to hire the seaman; and, (3) a causal connection exists between the non-disclosed *792 injury or condition and the injury and condition complained of in the instant suit. As explained in McCorpen, supra, 396 F.2d 547 at 549, "where the shipowner requires a seaman to submit to a prehiring medical examination or interview and the seaman intentionally misrepresents or conceals material medical facts, the disclosure of which is plainly desired....", a plaintiff forfeits his right to maintenance and cure. However, the concealment or misrepresentation must be material to the employer's decision to hire the seaman and must be causally related to the injury sustained after employment. Id.; Greaud v. Acadian Towboats, Inc., 628 So.2d 52, 54 (La.App. 1 Cir.1993).
Plaintiff does not refute that he fraudulently filled out the application for employment with McKinney. Plaintiff admits he purposely deceived McKinney. He testified he omitted a prior employer from his application, and lied when asked if he had any injuries. He also lied to the physician chosen by McKinney to do the pre-employment physical. He stated that he did so because he knew if McKinney knew of the injury, he would not be hired.
In his defense, plaintiff argues that the misrepresentations and omissions were immaterial because he worked for six months before the accident occurred. We are not persuaded by this argument. There is sufficient testimony that plaintiff would not have been hired if the injury was revealed. Plaintiff himself testified that he knew McKinney would consider it material. Further, there is sufficient medical evidence from plaintiffs treating physician that plaintiff had a permanent disability and specific restrictions that were incompatible with the job description of deckhand.
Hernandez also argues that McKinney should be charged with the knowledge of the injury. The crux of this argument involves a letter to McKinney from an attorney representing Hernandez in his claim regarding his back injury. That letter merely asks for information contained in Hernandez's personnel file. It does not indicate the nature of the representation. There is no indication that McKinney was privy to the information that Hernandez suffered a prior work related back injury in 1992.
Hernandez also challenges the causal connection between the prior injury and the one at issue herein. The record shows that Hernandez aggravated his pre-existing injury when he suffered the second injury. Hernandez's treating physician verified that fact in his testimony. The injury herein was to the lower back at the L4-5 disc, which is precisely where the prior injury ruptured the disc. Although Hernandez appeared to be healing from his original injury, Dr. Adatto testified that he had a permanent disability and the restrictions on lifting, prolonged stooping, and bending were still applicable.
Accordingly, given the circumstances in this case, we find the trial court was correct in its finding that Hernandez forfeited his right to maintenance and cure benefits through his misrepresentation of material facts.
As previously noted, Hernandez has also asserted claims of Jones Act negligence and of unseaworthiness. Our standard of review in such cases is the clearly erroneous standard. Noritake Co., Inc. v. M/V Hellenic Champion, 627 F.2d 724, 728 (5th Cir.1980). In Zapata Haynie Corp. v. Arthur, 980 F.2d 287 (5th Cir.1992), rehearing denied, 985 F.2d 555 (5th Cir. 1993), writ denied, Jackson v. Zapata, 509 U.S. 906, 113 S.Ct. 2999, 125 L.Ed.2d 692 (1993), the court summed up the standard *793 criteria as set forth in prior jurisprudence fully:
A factual finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Id. 980 F.2d at 289. (Citations omitted)
Our Supreme Court has explained that, while a plaintiff can join claims of Jones Act negligence and unseaworthiness in one action, to prevail he must meet two burdens of proof. Foster v. Destin Trading Corp., 96-0803 (La.5/30/97), 700 So.2d 199. In Foster, the court stated:
... plaintiff's asserted theories of recovery are separate and distinct, therefore he must meet two burdens of proof.
An injured seaman is allowed to join a claim for unseaworthiness, for maintenance, cure and wages, with a Jones Act suit. Seamen are allowed to bring their Jones Act claims in state court pursuant to the "saving to suitor" clause of the Judiciary Act of 1789. In matters involving admiralty and maritime jurisdiction, the saving to suitor clause permits state courts to have concurrent jurisdiction with the federal district courts. Id. 700 So.2d at 202 (citations and footnotes omitted)

NEGLIGENCE
Hernandez's next two assignments of error concern the trial court's failure to find McKinney negligent as a Jones Act employer. Hernandez argues McKinney failed to provide a safe place to work because it failed to inspect the work site, and it failed to provide sufficient lighting.
Pursuant to 46 U.S.C.App. § 688, a Jones Act employer is vested with a fundamental duty to provide its seamen with a reasonably safe workplace. Foster v. Destin Trading Corp., supra. In Foster, the court explained:
An employer's negligence may arise from a dangerous condition on or about the vessel, failure to use reasonable care to provide a seaman with a safe place to work, failure to inspect the vessel for hazards and any other breach of the owner's duty of care.
Unlike the duty owed to seamen for a claim of unseaworthiness, the duty to provide a safe workplace is not absolute, but reasonable care under the circumstances sets the standard. However, the burden of proof based on negligence is feather light and only the slightest degree of negligence is sufficient to impose liability on an employer. Id. 700 So.2d at 204-205 (citations omitted).
In the case herein, the assertions of negligence is that McKinney did not inspect the barges after cleaning to be sure no residue remained on the deck. In support of his position, Hernandez cites Nivens v. St. Louis Southwestern Railway Co., 425 F.2d 114 (5th Cir.1970), cert. denied, 400 U.S. 879, 91 S.Ct. 121, 27 L.Ed.2d 116 (1970), which states that the duty of a Jones Act employer includes a duty to inspect a third party's property for hazards and take precautions to protect the employee from possible defects. Hernandez asserts that the trial court erred when it found that there "was ample proof submitted to document that the barges had been cleaned." In the second part of Hernandez's objection to the ruling, he argues *794 that the lack of proper lighting was an act of negligence on the part of McKinney that leads to liability.
In the reasons for judgment, the trial court stated:
Plaintiff has not proven that McKinney was negligent by not providing a safe place to work. The only item of proof submitted to show grain on the barge was the unsubstantiated testimony of plaintiff. In fact, there was ample proof submitted to document that the barges were cleaned.
Plaintiff's testimony of grain being on the barge is even more suspect in light of his telling the first three physicians that he'd hurt his shoulder by throwing a ratchet (with no mention of grain or slippage of footing). This, coupled with the numerous times that plaintiff misrepresented the truth in the past, renders his testimony unbelievable.
Also, the fact that plaintiff had been working on the barge for one hour prior to the alleged incident under the same lighting conditions demonstrates the suitability of the lighting conditions at the time of the incident. This is corroborated by the Coast Guard report of the incident, wherein plaintiff said that lighting conditions were "fair".
At trial the only evidence presented that Hernandez slipped on wet grain was his testimony. Captain Williams testified that, when Hernandez radioed to tell him of the injury, Hernandez said he pulled a shoulder throwing a ratchet. He did not mention a back injury or a slip and fall and Captain Williams did not observe any grain, meal, or residue or Hernandez's clothes.
The record contains the accident report on the injury that is signed by Hernandez. The report states that Hernandez hurt his shoulder when he "picked up a ratchet". In a further explanation, the report states that Hernandez was injured when a ratchet slipped and hit his left shoulder. There is no mention of a slip and fall or a back injury. Records from the hospital where Hernandez was taken show that Hernandez told medical personnel that he injured his shoulder when he lifted a "beam." He did not mention a fall or an injury to his back. The emergency room physician who treated Hernandez, verified that Hernandez reported his injury as occurring when he was throwing some heavy metal and pulled his shoulder. Hernandez also gave the same account of injury to his shoulder to the company safety coordinator. He stated that he was in the process of moving rigging when a ratchet struck his shoulder.
In the accident report, Hernandez also stated the lighting was fair. At trial, he testified that he often used bullseye lamps that attach to the head like a miner's light, and although there were some on the barge, there were no batteries. However, he also stated that he preferred not to use one that day.
Testimony of McKinney personnel aboard the Anita Domino testified that they were in radio contact at all times with the crew on the barge and would have moved the tug in a better position to shine light on the barge if the crew indicated that was necessary. However, no complaints about the lighting or requests were made.
Given the evidence in this case, we cannot find the trial court erred in finding that Hernandez did not meet his burden of proving negligence.

UNSEAWORTHINESS
"The doctrine of unseaworthiness was introduced to general maritime law in 1903 in The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760. The case holds that an owner is responsible to the *795 captain or any seaman thereof for injuries received because of the unseaworthiness of the vessel. This liability was imposed on the owner by the Merchants' Shipping Act of 1876, and there is an implied obligation that all reasonable means shall be employed to insure the seaworthiness of a vessel before and during voyage." Foster v. Destin Trading Corp., supra 700 So.2d at 202. (Footnote omitted)
Only when all of a vessel's appurtenances and crew are reasonably fit and safe for their intended purposes, is a vessel considered seaworthy. Griffin v. LeCompte, 471 So.2d 1382 (La.1985). The duty to maintain a seaworthy ship is absolute, nondelegable, and completely independent of the Jones Act requirement to exercise reasonable care. To prevail on a claim of unseaworthiness, a plaintiff must prove that the unseaworthy condition was the proximate cause of his injury. Youn v. Maritime Overseas Corp., 605 So.2d 187, 198 (La.App. 5 Cir.1992), modified on other grounds, 623 So.2d 1257 (La.1993), writ denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Because the claim of unseaworthiness is not based in negligence, and is absolute, liability does not depend on negligence, fault or blame. Thus, if an owner does not provide a seaworthy vessel, no amount of prudence will excuse him, whether he knew or should have known of the unseaworthy condition. Foster v. Destin Trading Corp., supra, 700 So.2d at 202-203, citing, T.J. Schoenbaum, Admiralty and Maritime Law, Second Edition § 6-26 (1994). Unseaworthiness results from a defective condition and is not the result of an isolated negligent act. Daughdrill v. Ocean Drilling and Exploration Co. (ODECO), 709 F.Supp. 710 (E.D.La.1989).
In the instant case Hernandez makes the same charges concerning a wet, mushy substance on the deck and the lack of lighting, which were used to support his claim of Jones Act negligence. The trial court found that Hernandez failed to meet his burden of proof in this claim for the same reasons he found there was insufficient proof in the negligence claim.
Even considering the absolute duty to provide a seaworthy ship, we cannot say the trial court erred in his finding that there was no showing of unseaworthiness in this case.
Accordingly, we affirm the judgment.
AFFIRMED.
NOTES
[1] Various cross-claims were filed among the defendants, but were resolved prior to trial and are not at issue in this appeal.
[2] Although plaintiff's claims against Welcome and McKinney Barge are still outstanding, this is an appealable judgment under LSA C.C.P. art. 1915 as it existed at the time this action was filed.